## LIVERNASH *v.* DELORME.

1. EVIDENCE—PEDIGREE—BAPTISMAL CERTIFICATE—ADMISSIBILITY.
   In ejectment, where the question of defendant's pedigree was involved, a certificate of baptism issued by a church according to its custom and kept by the alleged parents in the family bible until their death, is admissible, where verified by an eyewitness to the baptism, and its weight is for the jury, although it is not a church record, nor, in a legal sense, an ancient document implying an age of over 30 years.

2. SAME—STATEMENTS OF PARENTS.
   Proof of statements and admissions of the alleged parents that defendant was their child, *held*, admissible.

3. SAME—POSITIVE TESTIMONY—SECONDARY EVIDENCE.
   Testimony of a witness that she knew that the alleged mother of defendant was not her mother, where full of inconsistencies and contradicted by other witnesses, *held*, not such positive testimony as to exclude secondary evidence, and its weight was properly for the jury.

4. SAME—STATEMENTS OF MOTHER AT TIME OF BIRTH OF CHILD.
   Statements of the alleged mother as to the birth of defendant, made about the time she was born, the mother now being dead, *held*, admissible.

5. PARENT AND CHILD—LIVING TOGETHER—PRIMA FACIE EVIDENCE.
   The existence of the relation of parent and child is a ques-
   tion of fact, and is established *prima facie* where it is
   shown that the parties lived together, and recognized by
   their acts the existence of that relation.

6. WITNESSES—CROSS-EXAMINATION — REPUTATION IN COMMUNITY
   AS TO BEING DAUGHTER OF ALLEGED PARENTS.
   Where a witness had testified that defendant grew up in a
   certain community and was always known by the name
   of her alleged parents, it was not error to allow, on cross-
   examination, questions as to whether she was known as
   their daughter, and as to whether they held her out as
   their daughter.

7. TRIAL—ARGUMENT OF COUNSEL—CURING ERROR.
   In ejectment, where the question of defendant's pedigree
   was involved, argument by her counsel that plaintiff was
   seeking to "bastardize this girl," and that her good name
   was involved, *held*, not reversible error, where the trial
   court sustained plaintiff's objections, and stated that de-
   fendant's legitimacy was not involved, but only the ques-
   tion as to whether the alleged father and mother were
   her parents.

Error to Gogebic; Barton (Joseph), J., presiding.
Submitted October 24, 1919.   (Docket No. 12.)   De-
cided December 22, 1919.

Ejectment by George H. Livernash against Leo W.
DeLorme and another.   Judgment for defendants.
Plaintiff brings error.   Affirmed.

*Belmont Waples* (*Harold J. Waples*, of counsel), for
appellant.

*James A. O'Neill*, for appellees.

STEERE, J.   This is an action of ejectment tried in
the circuit court of Gogebic county, involving posses-
sion of and title to a property in the city of Ironwood
described as the southerly 90 feet of lot 12 in block
4 of said city, according to the recorded plat thereof,

together with the appurtenances thereon. The trial resulted in a verdict and judgment for defendants and plaintiff brings the case to this court for review on various assignments of error. Both parties claim title through one Harvey W. Darrow, deceased, who died a widower and intestate on August 2, 1914, in his home on the property in dispute where he was residing with Ethel DeLorme, then, and always before her marriage to defendant Leo W. DeLorme, known as Ethel Darrow and recognized by deceased as his daughter. Plaintiff claims title by mesne conveyances under a deed from George W. Darrow, a brother of deceased, who resided at Necedah, Wisconsin, and held a trust deed of the property to him from four other brothers with their wives and three sisters of deceased, all adults residing in various other States. Defendant Ethel Darrow-DeLorme claims title as the daughter and sole heir at law of deceased. The case turns upon the question of whether she is his daughter, which plaintiff denies.

Varied only in minor details the introductory and practically undisputed facts are in outline as follows: Harvey W. Darrow, deceased, was for many years a merchant in the village of Hurley, Wisconsin, just across the river and State line from the city of Ironwood, and in 1892 was married to Elizabeth Darrow, sometimes called Eliza. They belonged to and were regular attendants at the Methodist church in that village for many years. Before March 1, 1895, Mrs. Darrow left Hurley and was absent from home for some weeks, just how long is not clearly shown. After her return they had defendant Ethel in their home, then a very small infant, whom they apparently recognized as their offspring, whose age is variously stated by the living witnesses who first saw her there as from a few days to a few weeks. She was presented for baptism in the Methodist church at Hurley

on March 1, 1895, and baptized as the infant daughter of Harvey W. and Elizabeth Darrow. From that time until the death of Elizabeth Darrow she lived in the home of Harvey and Elizabeth Darrow, was cared for, known, recognized, educated and introduced to others as their daughter and always so known and understood in the community where she grew up and in the schools she attended. After Elizabeth's death she resided with Harvey Darrow as his daughter in their home until his death. After the death of Harvey, proceedings were instituted to probate his estate in the probate court of Gogebic county on petition of Alfred H. Darrow, a brother, in which the claimed parentage of Ethel DeLorme was denied and an order entered by the court determining the heirs of said deceased to be his eight brothers and sisters. Defendant Ethel kept possession of and continued to reside in the home in which Harvey W. Darrow died, claiming it as his daughter and heir until these proceedings were brought.

The issue of her parentage was submitted to the jury by the court, and under plain instruction that the narrow issue of fact for them was whether or not Ethel DeLorme was the born child of Harvey W. Darrow, advising them that the record evidence showed, by the probate court proceedings and mesne conveyances, the legal title stood in plaintiff; and that under their special notice of defense it was incumbent upon defendants to show by a preponderance of evidence that Ethel DeLorme was "the own daughter of Harvey W. and Elizabeth Darrow." That sole issue was submitted to the jury by a special question in writing, to which the jury answered over their signatures, "Yes."

Plaintiff's counsel by motion and request upon the trial, followed by motion for a new trial, with properly preserved exceptions, urged a directed verdict in

his favor on the ground that "hearsay statements in favor of the defendants could not prevail against positive testimony in his (plaintiff's) behalf that Mrs. DeLorme was not the daughter of Mr. and Mrs. Harvey W. Darrow." Apparently the only fault found with the charge is refusal of the court to direct a verdict as requested. That proposition is closely related to plaintiff's various assignments of error on admission of testimony against objection which, it may be conceded, if inadmissible and rejected, would leave defendants with scant proof. The objections are directed against testimony to statements, representations or holding out by Harvey W. Darrow and wife that they were the parents of the girl, Ethel Darrow, all evidence of general reputation and understanding in the community to that effect, the admission of her baptismal record, letters from Harvey Darrow to her with the addresses, descriptive beginnings, conclusions, etc., a letter from Ida Myers, a living sister of Darrow, addressing her as "niece," and other somewhat similar items of claimed hearsay evidence.

Of the letter from Ida Myers, we think it sufficient to state that she was a party in interest, had joined with her brothers and sisters in the trust deed to George W. Darrow who apparently deeded to plaintiff for the purpose of this litigation, which was commenced shortly thereafter, and Alfred Darrow, on whose petition his brothers and sisters were determined the heirs of Harvey Darrow in the probate court, testified that plaintiff paid no consideration for the deed and was not to pay anything until the case was settled and "if the title is wrong wouldn't be expected to take it." This witness also testified that it was "a general understanding" in the Darrow family that the girl Ethel was not the daughter of Harvey, while this family letter written *ante litem motam* by a sister now interested to the contrary shows she

then designated deceased and Ethel as "Dear brother and niece," concluding, "Lovingly sister and aunt Ida."

The baptismal certificate objected to reads as follows:

"This certifies that Ethel Eliza, infant daughter of H. W. and Eliza Darrow, born in Hurley on the first day of March, 1895, having been presented for Holy Baptism and it having been solemnly promised that she shall be taught the nature and end of this Holy Sacrament, and all other things which a Christian ought to know and believe in order to lead a virtuous and holy life, was this day baptized by me in the name of the FATHER, and of the SON and of the HOLY GHOST according to the Discipline and Usages of the Methodist Episcopal Church.

 (Signed) "E. T. BRIGGS, Pastor M. E. Church.
            "1895."

This was produced and identified by Mrs. DeLorme as her baptismal certificate which had always been kept in the family bible of her claimed parents ever since she could remember and was there at the time of the death of Harvey W. Darrow. It was shown that she was raised by them in the Methodist faith and was a member of that church, that it was the custom for clergymen of that church to issue certificates of baptism. Mrs. McCamus, who had lived long in Hurley and knew Mr. and Mrs. Harvey W. Darrow for about 24 years, testified that she belonged to and attended the Methodist church there, as they did also, that she had known Ethel since she was a baby, was present in the Methodist church when she was baptized by Mr. Briggs, who was its minister at that time, that the baby so baptized continued to live in the household of Mr. and Mrs. Harvey W. Darrow as their child and was called Ethel Darrow, from that time until Mrs. Darrow died, and with Mr. Darrow until he died; that one pleasant morning while Ethel was yet a baby, witness was passing the Darrow home and saw

Mrs. Darrow out in the yard with her. They talked about the baby with some pleasantries in regard to her and witness remarked that she resembled her father, to which Mrs. Darrow replied: "Why shouldn't she look like her father? She is Harvey Darrow's own child," and in their following conversation told how low she was at the time Ethel was born, saying, "I like to have died. They despaired of my life"; that witness had been a nurse and on later occasions was called to Mrs. Darrow's home to care for her, at which times Mrs. Darrow more than once made mention of the child's birth.

As argued by plaintiff, it may be conceded that this certificate of baptism is not shown to be a church record nor in a legal sense an ancient document, which implies an age of over 30 years. Neither would it in any event be conclusive evidence standing alone of parentage or date of birth (*Durfee* v. *Abbott,* 61 Mich. 471), but we think the undisputed circumstantial evidence bearing upon its authenticity rendered it admissible for the jury to consider in connection with all other testimony in the case and give such weight as they deemed it entitled to. It was circumstantially verified by the direct testimony of an eyewitness that defendant Ethel was actually baptized when an infant about the time it indicates, in the Methodist church at Hurley by Mr. Briggs, the then pastor; that for many years, and always since Mrs. DeLorme could remember, it had been kept by Harvey W. Darrow and wife in the family bible at their home where it remained until after both were deceased, by permissible inference preserved in the family bible as a family record and recognition by them of its verity in a sense and to a degree with like solemn import as though the facts it stated had been recorded in that sacred book —of all which the weight and significance were for the jury.

Counsel on the respective sides are apparently not in disagreement as to the rule recognizing the admissibility of hearsay evidence in issues of this nature, based on the difficulties of establishing descent by direct testimony of eyewitnesses to marriage and birth, according to the strict rules of primary evidence. For which reason in cases involving pedigree recourse has long been permitted "to a secondary sort of evidence; the best the nature of the subject will admit; establishing the descent from the only sources that can be had." *Vowles* v. *Young*, 13 Ves. 140. But it is contended for the plaintiff that all proof of statements and admissions of Harvey W. Darrow and his wife in whatever form, orally or by letters, was hearsay evidence and incompetent, because "positive testimony to the contrary of a living witness who knows the facts" was introduced by plaintiff on rebuttal to the defense. That witness as pointed out in plaintiff's brief is Mrs. Mary Langford, who, it is stated, "testified that she knew Mrs. Eliza Darrow well just before Ethel first appeared and that Mrs. Eliza Darrow was not Ethel's mother." An examination of her testimony shows that she had no first knowledge of where and when Ethel was born and made her positive assertions largely on inferences of facts in dispute and hearsay. She had not lived in or near Hurley for over 16 years before she was a witness, but when residing there prior to that time knew Mr. and Mrs. Harvey W. Darrow. She was then a seamstress, and testified that on April 10, 1895, she was sent for by Mrs. Darrow to do some sewing for her when she for the first time saw Ethel, then an infant whom she judged about four weeks old, lying in a rocking chair; that a nurse was there whose name she did not know but who only stayed between trains; that witness understood from what the nurse said the baby was born March 10 and came from a home in Chicago. She

did not remember ever having talked with Mrs. Darrow about the parentage of the child, but knew Mrs. Darrow was not its mother, that she did not know of her bearing a child within six months before that time, and thought she would have known of it if such were the case. On cross-examination she testified:

"This child was brought to Hurley by a nurse; that is my understanding. * * * I wasn't there when the child was brought. I don't know whether or not Mrs. Darrow came back with the child. * * * I don't know personally who brought the child there, or, of my own knowledge, when she was brought there or who the mother of the child is. I know she was raised as Ethel Darrow and known in the community as Ethel Darrow and baptized in the Methodist church at Hurley. * * * I didn't charge my mind with any of the facts connected with the parentage of this child."

Having stated she didn't know whether or not Mrs. Darrow came back with the child, she later asserted she knew she was not absent from Hurley at any time during the three months prior to April 10 and was basing her answers on the theory that she was not absent during that time. She did not remember the day of the week April 10 came on, but remembered that date because it was shortly before her marriage, which took place June 19. Asked how many times she saw Mrs. Darrow in the three months before April 10 she answered, "once a week in church," and later answered she did not remember if she saw her the Sunday before that date, or the second Sunday before then, or the third, and afterwards said, "I know that I saw her the week before I saw this child, that Sunday at church." In view of the many inconsistencies in her own testimony and direct contradiction of facts testified to by other witnesses it was manifestly for the jury to pass upon what credence should be given to the assertions of this witness.

The record also contains substantive testimony not bare hearsay which if believed tends to show Mrs. Darrow was the mother of this child. Mrs. Sullivan, who knew Mrs. Darrow well from the time she was married until her death, and Ethel since she was a little baby, stated in reference to Ethel's first appearance in Hurley that Mrs. Darrow, who was a large woman, was "unusually large" before she went away about the first of February, was absent several weeks and "came back with her baby," at which time "she was much smaller," that in conversations upon the subject Mrs. Darrow told her she was never so sick as when Ethel was born and nearly died.

In the recent case of *Kotzke* v. *Kotzke's Estate,* 205 Mich. 184, it is said:

"The question of pedigree being involved and plaintiff's mother being deceased, we are impressed that her statements made about the time the child was born and when there was no probability of untruthfulness on her part and nothing to prompt her to conceal the facts from the members of her own family, were not objectionable within the hearsay rule but were admissible."

It stands practically undisputed that Ethel lived from early infancy in the Darrow home with Harvey W. Darrow and wife in the relation of parents and child, treated and recognized by them in word and act as their daughter. In 29 Cyc. p. 1583, the relation of parent and child in general is thus stated:

"The term 'parent and child' is used to indicate the relation existing between husband and wife, or either of them, on the one hand, and their legitimate offspring on the other. The existence of the relation is a question of fact, and is established *prima facie* where it is shown that the parties lived together, and recognized by their acts the existence of that relation."

Upon the vital point plaintiff also produced admissible hearsay testimony to the contrary of that produced by the defendants, and, as we view it, a clear issue of fact was made for the jury. As this court is only concerned with the admissibility and sufficiency of defendants' testimony to raise an issue for the jury it is unnecessary to review that of plaintiff or consider the claims of the respective sides as to the convincing qualities of their testimony and weakness of that opposed.

Counsel cite but two instances in the record where objection was made to admitted testimony claimed objectionable on the ground its purport was to prove general reputation in the community. Francis Jewell, a witness for plaintiff, testified on cross-examination without objection to several apparently undisputed facts and said: "This baby grew up to be a young woman in Hurley and was always known to the community as Ethel Darrow. *Q.* As the daughter of Mr. and Mrs. Darrow?" to which plaintiff's counsel objected on the ground "that rumor and reputation are immaterial in cases of this sort and do not tend to establish pedigree." The objection being overruled the witness answered "Always." In the other instance a witness of plaintiff was asked on cross-examination, "*Q.* And she was known and held out by the parents as Ethel Darrow, their daughter, during all that time?" To which objection was interposed on the ground that "a holding out doesn't tend to establish pedigree." The objection was overruled and the witness answered:

"Yes, Mr. and Mrs. Harvey Darrow were regular attendants at the Methodist church in Hurley both before and after this baby came and they took her to that church always and she grew up in the Methodist faith."

208—Mich.—20.

While these generalizing questions are perhaps near the border line, in view of the connection in which they were asked on cross-examination, and other volunteered testimony of similar import not objected to or moved stricken out, we find no reversible error in the ruling.

The remaining argued assignment of error is directed against two claimed prejudicial comments of defendants' counsel, who on opening the case to the jury stated defendants proposed to show no one ever questioned the legitimacy or parentage of the girl until her parents were dead and left her property which the brothers and sisters, particularly Alfred Darrow, wanted, and to that end he was seeking to "bastardize this girl,"—to which plaintiff's counsel objected, saying there was no claim "Mrs. DeLorme is illegitimate or a bastard." The court sustained the objection, with the further comment that counsel's opening statement must not be argumentative. In summing up the case to the jury defendants' counsel while arguing its importance to Mrs. DeLorme said, "but it involves all that is dear to this girl in the world. Irrespective of what these gentlemen on the other side say, it involves the good name of this woman, which is a more priceless heritage than any property which Harvey W. Darrow left," and counsel for plaintiff then objected to that line of argument, saying that there was no claim on the part of plaintiff "which in any way involves the legitimacy of Mrs. DeLorme." The objection was sustained, the court saying,—apparently to or at least in the presence of the jury,—

"Mr. ............... is misstating the position of the plaintiff in this case in arguing that the legitimacy of the child is involved. That is not true. The question is whether Harvey W. Darrow and his wife were the father and mother of this girl."

Counsel for defendants, argues in his brief with

some force that not only did the reprimand, or emphatic contradiction of the court, cure any possible prejudice which might otherwise arise from what was said, but the comment, so far as made and intended, was permissible argument in view of the testimony which plaintiff had introduced and claim made implying that Mrs. DeLorme when an infant was a waif or foundling taken out of some home in Chicago. Of this objection the trial court said in denying plaintiff's motion for a new trial:

"The 10th and 11th reasons relate to the alleged improper conduct of counsel for defendants in his opening statement, and argument to the jury. On both occasions complained of the court sustained the objection of plaintiff's counsel, and in so doing took occasion to correct any error that might have resulted. Plaintiff's counsel presented no requests to charge relating to this matter, and it must be assumed that they were content with the action taken by the court."

Finding no prejudicial error demanding reversal, the judgment is affirmed.

BIRD, C. J., and SHARPE, MOORE, FELLOWS, STONE, and KUHN, JJ., concurred. BROOKE, J., did not sit.