District of Columbia's Appeal.

66

Argued April 28, 1941. Before SCHAFFER, C. J.,
MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Joseph Sharfsin,* with him *Abraham Wernick,* for
appellant No. 82.

*Delbert T. Kirk,* with him *H. Lawton Russell,* for
appellants Nos. 120 and 121.

*George H. Detweiler,* with him *Adolph Gutberlet* and
*George C. Sweeten,* for appellants No. 150.

*Henry A. Craig,* for appellees.

OPINION BY MR. JUSTICE PARKER, September 29, 1941:
Helen Marie Fink, of Washington, D. C., on April 10,
1929, delivered certain securities to the Girard Trust
Company under a deed of trust in which she provided
for the payment of the net income of the trust to herself
for life and of the corpus after her death in accordance

with her will or, in case of intestacy, "to be paid over and distributed in accordance with the Intestate Laws of the District of Columbia."

While at sea on a voyage from New York to California, Miss Fink disappeared, having been last seen alive on April 2, 1930. The following day her cabin door was found locked on the inside and when the room was broken into, from its condition it was inferred that she had cast herself through the porthole into the sea and perished. She did not leave a will. The trustee having filed a final account, a fund of approximately $75,000 awaits distribution.

The problem presented to the auditor and court below was to determine whether the evidence was sufficient to identify any persons as her next of kin. Three sets of heirs claimed the fund: (1) the Fink claimants, surviving brothers and sister of John J. Fink, who claim that Helen Marie Fink was the natural and legitimate child of John J. Fink and Cora Fink, his wife, both deceased; (2) the Weis-Leahy claimants, consisting of William Weis who claims the fund as the father of Helen Marie Fink, and heirs of Helen Marie Leahy Weis (called Nellie), the wife of William Weis;[1] and (3) the King claimants, the heirs and next of kin of one Carrie B. King, who claim that Helen Marie Fink was Carrie King's illegitimate daughter. If all these claimants fail to establish their kinship the fund goes to the Commissioners of the District of Columbia to use for the benefit of the poor, under the intestate laws of that District.

The court below referred the matters in controversy to an auditor who made seven different reports. Several of these dealt with important matters not now in controversy so that it is necessary to refer only to the third and seventh reports of the auditor. In his third report

---

[1] The Weis claim is based on the presumption of legitimacy of Nellie Weis' alleged child; the Leahy claim is based on the contention that Nellie Weis' alleged child was illegitimate, with the result that only the child's mother's heirs could inherit.

the auditor found as a fact that Helen, or Ellen, or Nellie Marie Leahy Weis, was the mother of Helen Marie Fink, the deceased, and that William Weis, the lawful husband of Nellie, was the father, and sustained the claim of William Weis and the Leahy heirs. After more reports, the testimony of Grace Leahy, an alleged aunt of the decedent, was added to the record, and with that additional information the auditor filed his seventh report in which he reversed his former finding and found as a fact that Helen Marie Fink was not the natural child of Nellie M. Weis, denied the claim of the Fink heirs and the King heirs, and directed distribution to the District of Columbia in the absence of known heirs or next of kin.

On exceptions, the Court of Common Pleas No. 4, of Philadelphia, in an opinion by its experienced and able President Judge, overruled the auditor, sustained the exceptions filed on behalf of the Fink claimants, and awarded the fund to them.

In view of the fact that the auditor and the court below rejected the claims of the King heirs and the Weis-Leahy heirs, we will confine our attention for the present to a consideration of the claim of the Fink heirs.

Helen Fink during her lifetime and all the claimants since her death have made diligent and persistent efforts without success to find a record of the birth of Helen Marie Fink, or other direct proof of the circumstances of her birth. A baptismal certificate from St. Stephen's Church in Washington was introduced into evidence. It showed that she was baptized October 10, 1894, as the child of John and Cora Fink. It also recites that she was born May 4, 1894. The witness for the Finks who claims to have seen Helen at the earliest date was William Fink, a brother of John Fink. He testified that at the request of his brother John he had gone from New York City to Jersey City in the fall or spring thirty-eight years before the date at which he was testifying (which would be 1893) and there found Mrs. Fink in bed with a baby a month or less old. He further testified that he had seen

this child, Helen Fink, every few months until she was seventeen years of age. Henry Murdoch, formerly secretary to John Fink and a member of the Fink household for two or more years, testified that in 1892 or 1893, when the Finks returned from one of Fink's business trips, they had a very young baby with them and that he thought before they left on that trip that Mrs. Fink was pregnant. The child became very ill when it was about three months old and Murdoch called a priest named Father Gloyd from St. Stephen's Church, and the child was baptized Helen, with Murdoch and the child's nurse acting as sponsors.

One other witness called by the Fink claimants was John Wooster, a fireman on duty near the Fink residence from the fall of 1893 to July, 1894. He said that he had become acquainted with John Fink in the fall of 1893 and occasionally visited the Fink home, that he distinctly remembered that there was a baby in the house Christmas, 1893; and, further, that he had never heard of any death in the family. His testimony, taken in connection with other evidence to which we will refer, is in fact against the Fink claim since it indicates that the baby he was referring to was Cora A. Fink, as to whom more will later appear.

The testimony of the Finks showed that John J. Fink and Ida Corinne Moore were united in marriage by the pastor of the Seventh Baptist Church of Baltimore on the 28th day of February, 1891. It was essential, as will later appear, that these claimants should show the date of Helen's birth. The evidence suggests no other date than May 4 or 5, 1894. Helen at all times recognized May 5, 1894, as her birthday, and her own declarations were evidence of that fact: *Simon v. N. Y. Life Ins. Co.*, 70 Pa. Superior Ct. 408. Their testimony was to the effect that Helen remained in the household of John and Cora [Ida Corinne] Fink until 1901 when the wife, Cora Fink, died. From that time until 1910, Helen lived with John Fink and his sister, Rida Fink. In 1910 she ob-

tained employment and went to live at St. Catherine's, an institution for working girls in Washington. She remained there until 1917 and from that time until her death lived at various places not here significant. John Fink died January 9, 1919.

Although Murdoch was called by the Finks, his testimony not only failed to support their claim but tended strongly to rebut it when taken in connection with baptismal records and his failure to explain contradictions raised thereby and discrepancies in his own testimony. There was the baptismal certificate of Helen Marie Fink, to which we have referred, and there was also produced a record of the baptism of one Cora Arinthia Katherine Fink, child of John J. Fink and Ida C. Moore, baptized February 13, 1894, "at home in danger of death", by Rev. John Gloyd, with Henry Murdoch as sponsor. There was also placed in evidence a transcript of the certificate of death of this same Cora Fink, showing that she died February 13, 1894, at the age of three months and twenty-one days. While for reasons later stated the dates of birth given in the baptismal certificates as the dates of birth of these two children were not admissible for that purpose, the age of the child Cora at death was shown by other convincing testimony. The doctor who attended the child in its last illness and was present when it died testified that she was then about three months of age, corroborating in that respect the testimony of Murdoch. It is most apparent, therefore, that the child Murdoch was referring to died the day it was baptized and was not Helen Fink.[2] In fact, the auditor found, affirmed by the lower court, that Cora A. Fink was the daughter of John and Cora Fink. There was evidence to support this finding in addition to that to which we have referred. It is difficult to read the testimony of the brother, William Fink, and the fireman,

[2] The baptismal certificate of Helen shows that the officiating priest was Reverend O'Connell and the sponsors were A. M. Van Haacke and Marie Van Haacke.

Wooster, in the light of this documentary proof without coming to the conclusion that their evidence gave no support to the Fink claim.

The baptismal record and the death certificate of the child, Cora A. Fink, taken with the claimants' own evidence as to the age of the child when it died, not only negative the testimony of the witnesses referred to but also show conclusively that a natural child could not have been born to Mrs. Fink on May 5, 1894. We have not only common experience to guide us to that conclusion, but also the testimony of a physician made a part of the record.

In 1913, when she was nineteen years of age, Helen began to have doubts as to her parentage. John J. Fink, on October 16, 1913, wrote Helen two letters in which he expressed serious concern that she was questioning her parentage, stated that the reports she heard were idle gossip, and promised to give her the names of the doctor and nurse who attended Mrs. Fink when Helen was born. This he apparently never did. These doubts had such an effect upon her that she attempted to commit suicide after one of the Fink aunts said to her that she was not the child of John Fink. Later she made extensive investigations at a number of places in an attempt to ascertain her true parentage. In 1919 or 1920, she called on Michael J. Leahy and informed him that his deceased sister, Nellie Leahy Weis, had been her mother.

In a passport application in 1927, Helen gave the name of John Fink as her father and the lower court considered that this indicated that she had abandoned her earlier idea that she was a foster child. This inference seems scarcely permissible as she would hardly reveal her own uncertainty as to her parentage in such a document, and her later acts lead us to a different conclusion. At that time she had not determined with certainty the name of her natural parent; consequently, she inserted the name of John J. Fink whom she knew to be at least her foster parent.

There was also offered in evidence a letter written by John Fink to Helen on December 23, 1918, in which he told her that she had been adopted by the Finks when she was a month old and that he thought her father's name was N. or E. Webster. At the time this letter was written, Fink was confined to St. Elizabeth's Hospital, an institution for mental patients. He had originally been admitted to the institution at his own request but subsequently, November 22, 1918, he was adjudicated insane after jury trial in a lunacy proceeding held in the Supreme Court of the District of Columbia. The auditor, in spite of these circumstances, held that the letter was admissible. The lower court ruled it inadmissible. The propriety of this ruling will be discussed hereafter.

The lunacy adjudication recited that Fink had an adopted child, Helen Fink, and the records of St. Elizabeth's Hospital made at the time of his admission contained a similar statement. There was evidence that Rida Fink had told several persons that Helen Fink was an adopted child, although this was denied by Rida.

A portion of the evidence recited should have been rejected by the auditor when he came to a final consideration of the case. He admitted in evidence, but the lower court rejected, the letter written by John Fink when he was in St. Elizabeth's Hospital. This letter was written after Fink had been adjudicated an insane person in a lunacy proceeding held in the Supreme Court of the District of Columbia. "It is generally accepted that the fact that the witness is, at the time of testifying, or was shortly beforehand, a lawful inmate of an asylum for mental disease or defect, or an adjudged lunatic or defective, makes it necessary that his capacity should be examined into and an express finding appear": Wigmore on Evidence (2d Ed.), §497. Also, see 7 A. L. R. 606, and 68 A. L. R. 1319. The adjudication of insanity having been proved, a presumption of testimonial incompetency arose which placed on those offering Fink's letter the burden of showing that at the time it was written he had testimonial capacity. There is nothing in the case

of *Com. v. Loomis,* 270 Pa. 254, 113 A. 428, relied upon by the auditor, at variance with the principle we have stated. We were there interpreting the meaning of the term "incompetent to testify", under the Act of May 23, 1887, P. L. 158, §3 (19 PS §582), and the witness, who had not been declared incompetent generally, was available for examination to determine his capacity.

The record of the admission of John Fink to St. Elizabeth's Hospital, showing that John Fink had an adopted daughter Helen, was not admissible as proof of the relation of John to Helen. The social worker, who had made the record, stated that she had no independent recollection of the matter set forth, even when aided by her own memoranda made at the time, except that she was certain the information was obtained from Rida Fink, a claimant, who was present at this hearing and testified. To meet the well settled tests for admissibility, the "witness must of course have had personal knowledge of the facts recorded in the first instance": Wigmore on Evidence (2d Ed.), §747. They were not receivable under the pedigree exception to the hearsay rule as Rida was not only available as a witness but present at the hearing. In *Paxos v. Jarka Corp.,* 314 Pa. 148, 171 A. 468, we pointed out the limits on the admission of such records and indicated the probative elements that must be present. Among these was the requirement that the maker of the record must have knowledge of the facts which he records. Also, see Wigmore on Evidence (2d Ed.), §1635.

The appellees argue the admissibility of the recitals of birth dates in the baptismal records of Helen Fink and Cora Fink and in the death certificate of Cora Fink. It is settled in this state that such certificates are admissible to prove the fact and date of baptism or death but not to prove the birth date: *Clark v. Trinity Church,* 5 W. & S. 266; *Sitler v. Gehr,* 105 Pa. 577. Also, see 36 A. L. R. 691.[3] The auditor recognized the limitations established

---

[3] Professor Wigmore suggests that such statements should be received for what they are worth: Wigmore on Evidence (2d Ed.), §1646, p. 441.

by the Pennsylvania cases. In this connection, it should be borne in mind that there was competent testimony by Henry Murdoch and the doctor who attended the child, Cora Fink, in her fatal illness showing that the child was about three months of age when it was baptized and died. Helen Fink's own declarations indicated that her birth date was May 4 or 5, 1894. Consequently, the auditor's conclusion does not rest on the recitals of birth dates contained in the baptismal certificates.

Dismissing from our consideration the incompetent evidence, it appears that the Fink heirs must rely alone on the facts as to where and how Helen Marie Fink spent her childhood days, illuminated by the declarations of John Fink as to pedigree and family reputation. This makes necessary further reference to some legal principles. It has been stated as a general rule that "the existence of the relation [of parent and child] is a question of fact, and is established prima facie where it is shown that the parties lived together, and recognized by their acts the existence of that relation": 46 C. J., Parent & Child, §1; *Livernash v. DeLorme,* 208 Mich. 295, 175 N. W. 177, 180. The auditor held "that the Finks are not entitled to the benefits of any presumption arising from Helen's presence in the Fink household at an early age," and added the conclusion that even "if the Finks are entitled to the benefit of the family relation presumption, the Auditor is convinced that these facts more than rebut it." The court below held that the recognized status of Helen as the daughter of the Finks, living in their household until she was sixteen years of age, raised a presumption or made out a prima facie case in favor of the Finks, and said that in its opinion "it is plain from the adjectives used by the courts that the burden of proof against a recognized relationship must be of great weight. The phrases used are of the strongest, 'clear, precise and indubitable', 'proof beyond a reasonable doubt', proof that is 'irrefragable', 'strong, direct and satisfactory proof'."

To say that the relationship is established "prima facie" may mean either that enough has been shown to

make a finding of the existence of the relationship permissible or it may mean that such finding is obligatory in the absence of other evidence: Wigmore on Evidence (2d Ed.), §2494. It would seem that if the fact finding body believed the evidence of the proponents, the latter is the proper meaning here. If it were shown that a child had been reared and recognized as the child of a married couple, that should be enough to raise a presumption that he was in fact their child, even though no evidence were presented to prove his birth to them. Inasmuch as the lower court reversed the conclusions of the auditor almost solely because of the effect it deemed this presumption to have, it is necessary to investigate carefully the nature of presumptions in general, this one in particular, and what is required to overcome such presumptions.

It is not open to question that the burden of proving their kinship by a preponderance of evidence was upon the Fink claimants just as it was upon the Weis-Leahy and King claimants. They sought to maintain this burden by showing the facts dealing with the relationship and relying largely upon what they treated as presumptions. However, the presumption itself is not evidence: *Watkins v. Prudential Ins. Co.*, 315 Pa. 497, 173 A. 644. When the presumption relied upon had been rebutted by sufficient evidence, the presumption passed from the picture, though the facts or actual evidence from which the presumption arose remained, free from any artificial effect, to be considered along with the other evidence. "The important thing is that *there is now no longer in force any ruling of law by the judge* requiring the jury to find according to the presumption. 'All is then turned into an ordinary question of evidence, and the two or three general facts presupposed in the rule of presumption take their place with the rest, and operate, with their own natural force, as a part of the total mass of probative matter. . . . The main point to observe is that the rule of presumption has vanished' [Thayer's Preliminary Treatise on Evidence, 346]; because its function

was as a legal rule to settle the matter only provisionally, and to cast upon the opponent the duty of producing evidence, and this duty and this legal rule he has satisfied": Wigmore on Evidence (2d Ed.), §2487. Also, see extensive discussions on this subject in *Tyrrell v. Prudential Ins. Co.,* 109 Vt. 6, 192 A. 184, 115 A. L. R. 392, 403, and in 95 A. L. R. 893. It cannot be doubted that when all the evidence was presented in this case the presumption had been sufficiently rebutted and that it became necessary to weigh the evidence on both sides for the purpose of ascertaining where the preponderance lay.

In our opinion the lower court erred in setting up too exacting a standard for the evidence necessary to rebut the presumption raised by the evidence bearing on the status of Helen as a part of the Fink family. We are unable to find any authority in our cases for the position that the quantity of proof required to rebut this presumption is the same as that which exists as to legitimacy. The adjectives quoted by the court below, such as "clear", "direct", "satisfactory", "irrefragable", "beyond a reasonable doubt", "precise", and "indubitable", are applicable to situations where the legitimacy of a child is in question. There are many weighty reasons why a child born in lawful wedlock should be presumed to be legitimate that are not common to the relationship of parent and child. It has become part of the substantive law of evidence in this state that the proofs necessary to rebut a presumption of legitimacy must be of the highest order. In fact, under the old rule the presumption of legitimacy where a child was born to a married woman could not be overcome by any proof less than the absence of the husband beyond seas during the whole time of gestation. While that rule has been somewhat softened, it is still a rigid one. See *Dulsky v. Susq. Collieries Co.,* 116 Pa. Superior Ct. 520, 177 A. 60. In fact, in pursuit of a well established public policy, we have gone so far as to hold consistently that non-access cannot be testified to by either the husband or wife in order to overcome the presumption of legitimacy: *Com. v. Shepherd,* 6 Binn.

283; *Dennison v. Page,* 29 Pa. 420; *County of Tioga v. South Creek Twp.,* 75 Pa. 433. The principles of public policy which have dictated these rules do not apply to the relationship of parent and child where the question is whether the relationship is that of a natural parent or a foster or an adopting parent. While the law frowns upon the violation of the marriage vows and treats such violations as crimes, it has encouraged in its whole course the assumption of duties by foster and adopting parents for the promotion of the welfare of children. Not only is such the case, but common experience indicates that the same rule should not be applied to the two situations. We know, in fact, that there is hardly a community or a locality where persons denied the blessing of parenthood have not voluntarily, with the highest motives, assumed the responsibilities of rearing and educating children and have treated them with the same love and devotion as if they were of their own blood. Such common experience shows that it would be unreasonable to say that a relationship other than that of a natural parent could only be shown by the highest grade of evidence. We hold that the presumption here involved may be rebutted by a fair preponderance of the credible evidence. It must be borne in mind that to hold that Helen was not shown to be the natural child of John and Cora Fink does not mean that she was illegitimate. She might still be an adopted or foster child of theirs. Legitimacy is not involved.

As we have indicated, the auditor and the court below have not differed as to the fundamental facts involved but only in the application of legal principles.

A careful review of the entire record has convinced a majority of the court that Helen Marie Fink, the decedent, was not the natural child of John and Cora Fink. She was convinced of that fact herself after extensive investigations. Members of the Fink family so viewed it. We have her own declaration that she was not the natural child of John and Cora Fink. The sole important item

of evidence to rebut this is the declaration of the father. While he persisted in asserting that Helen was his child, much doubt is cast upon that conclusion when we consider that for a considerable period prior to his death he was a heavy drinker and an addict to the use of drugs, that he was suffering from carcinoma of the eye, that he was an inmate in his last days of an asylum for insane, and that he was adjudged insane. Notwithstanding his solemn promise to furnish Helen with evidence as to the doctor who assisted at the time of her birth, the place of birth, and other evidence that would have calmed her fears, he failed to do so. Helen made her own investigations and concluded that he was not her father. We cannot agree with the court that Helen abandoned this thought in her last days. We do not so read the evidence when taken as a whole.

With respect to the Weis-Leahy claims, the question presented is whether Mrs. Weis, the wife of William Weis, was the natural mother of Helen. William Weis and the Leahy heirs have pooled their issues and eliminated the question as to the legitimacy of Helen so far as these claims are concerned. A pure question of fact was involved here and the auditor and court below found against the claimants. The finding was supported by the evidence and is therefore binding on us. The auditor refused to accept the testimony of the proponents of this claim and with much reason. The testimony of Grace Leahy, an interested party who testified against her own interest, removed any doubt as to the soundness of the conclusion.

The same general reasons exist for accepting the finding of the auditor and court below rejecting the claim of the King heirs. The auditor ably supported his conclusion whereby he rejected the claim in his third report which contained an exhaustive discussion of the facts. It would serve no useful purpose to repeat what he said as no important or doubtful question of law is involved. We might only add that this claim was seriously weak-

ened by the failure of the claimants to call as a witness an aunt of Mrs. King, Cora Parks' mother, who was living and should have known more about the important facts than any other living person: *Green v. Brooks,* 215 Pa. 492, 496, 64 A. 672. We cannot assent to the suggestion of counsel that uncontradicted testimony must be accepted as true: *Nanty-Glo Boro. v. Amer. Surety Co.,* 309 Pa. 236, 163 A. 523.

We conclude that none of the claimants has established his right to participate in this estate and that it must therefore go to the District of Columbia.

The decree of the court below is reversed and the record is remitted that an order may be made directing the payment of the fund to the District of Columbia. Each of the parties shall bear the expense of printing his own briefs and the balance of the costs shall be paid from the corpus of the trust estate.