## Meyers v. Metropolitan Insurance Company

Before Evans, P. J., Laub and Rossiter, JJ.

*Marsh, Spaeder, Baur, Spaeder & Schaaf,* by *Robert N. Spaeder* and *Robert J. Kilgore,* for plaintiffs.

*Gifford, Graham, MacDonald & Illig,* by *Peter G. Schaaf,* for defendant.

LAUB, J., August 14, 1964.—Plaintiff beneficiaries[1] of two life insurance policies brought suit to recover

---

[1] Two cases were tried together. The other case, to September term, 1963, no. 666, involves same defendant. Plaintiffs there are the parents of the deceased. Plaintiff here is the wife of the deceased. We are making a separate order in each case.

under the double indemnity provisions of said policies, alleging that the insured, Lyle D. Meyers, met his death, directly and independently of all other causes, solely as the result of bodily injuries inflicted by external, violent and accidental means. The sums due under the policies, exclusive of the provisions with regard to double indemnity, have been paid. After trial, the jury returned verdicts in favor of plaintiffs; defendant has moved for a new trial and for judgment n.o.v.

From the testimony it is clear that no one knows how Lyle D. Meyers met his death other than that he died by drowning. Five days after he presumably went to work, his body was fished from the waters of Presque Isle Bay, fully clothed. His automobile was found parked on the public dock; his wallet containing a small sum of money was discovered beneath the seat. There were lacerations on the back of each hand and on the ventral surface of each wrist, all of which, according to defendant's expert witness, were inflicted prior to death and gave the appearance of "hesitation cuts," i.e., self-inflicted wounds by one lacking skill or courage in an attempt at self-destruction. No eye witnesses were produced concerning the introduction of the body into the bay. Plaintiffs produced evidence, however, showing lack of motive on the part of deceased to commit suicide.

Various reasons have been assigned in support of the post-trial motions, and although there is grave doubt that plaintiffs met their burden of proof, we conclude that plaintiffs may have neglected to offer additional evidence because of the admission of the coroner's certificate into evidence. For this reason the motion for judgment n.o.v. must be refused. We are of opinion, however, that defendant is entitled to a new trial.

Plaintiffs, as a part of their cases in chief, introduced into evidence the certificate of the coroner filed by him in the Bureau of Vital Statistics in Harrisburg. This

certificate became one of the most hotly contested features of the litigation and, judging from the colloquy which took place between the trial judge and the jury when it returned for additional instructions, the certificate was the crucial point which turned the tide against defendant. Defendant strenuously objected to the receipt of the certificate at trial and has assigned its admission as one of the reasons why a new trial should be granted. It is important, therefore, to discuss the contents of the certificate and the circumstances surrounding the trial judge's conclusion that it was admissible.

The Vital Statistics Law of June 29, 1953, P. L. 304, sec. 204, 35 PS §450.204, provides that the State Department of Health shall prescribe the forms for all certificates required by the act, including all standard items which contribute to a uniform comparable nationwide system of vital statistics. The coroner, therefore, was obligated to fill out the form prepared by the Department. Unfortunately, however, the prescribed form demanded information from the coroner which he could only supply by an expression of opinion derived from conjecture, surmise, guess and hearsay. Thus, with respect to a question posed in box 21a of the form as to the nature of the occurrence which brought about death, the coroner was given three choices, accident, suicide, or homicide. Being thus faced with the necessity of completing the form notwithstanding he had no knowledge of the facts, as he later testified, the coroner inserted "Accident." However, in box 21f of the form, the coroner was asked "How did injury occur?," and to this question he answered, "Unknown—Body removed from bay." Thus, it is clear from the certificate itself that the label "Accident" was inserted wholly and completely without factual foundation.

When the coroner's certificate was offered in evidence, the trial judge was faced with the provisions of section 810 of the Vital Statistics Law of 1953, 35 PS §450.810, which render such certificates "prima facie evidence" of their contents.[2] Being of opinion that this section of the statute made the certificate admissible into evidence, as indeed such must have been the obvious intention of the legislature with respect to certain aspects of vital statistics records, the trial judge admitted it into evidence and submitted it to the jury along with all the other evidence in the case. In this he committed error which, had it not been for the nature of the certificate and the jury's obvious concern with its office, would probably have been harmless. However, it seems clear that the jury should never have seen the certificate and that undue prominence was given to it by the jury which was unduly impressed by the official character of the instrument.

Where the term "prima facie evidence" is used, it is sometimes intended to be the equivalent of a notion of a presumption and it is sometimes used to denote the place in a trial where the burden of going forth with the evidence shifts from one side to another: Mineo v. Eureka Security Fire & Marine Insurance Co., 182 Pa. Superior Ct., 75, 80, 125 A 2d 612. But no matter which concept is adopted, in this Commonwealth the result is the same. In this State a presumption is not evidence and cannot be substituted for evidence. It has no probative value and merely indicates the direction from which proofs must come: Watkins v. Prudential Insur-

---

[2] The forerunner of the present statute, the Uniform Vital Statistics Law which has been supplanted by the new act, provided that such certificates shall be prima facie evidence of the *facts* therein stated. (See Act of May 21, 1943, P. L. 414, sec. 13, 35 PS §505.13). The significance of the change from "facts" to "contents" does not appear from legislative records or any other source made known to the court.

ance Company, 315 Pa. 497, 173 A. 644. Therefore, whether a presumption was created or some other procedural method was intended when the legislature used the expression "prima facie evidence," the result was identical; the effect is merely to change the direction of the flow of proofs. When, as a consequence of its introduction into evidence, a certificate is considered and used by the finders of fact as substantive evidence, this is a perversion of its office and establishes trial error.

However, there are other matters affecting the admissibility of the certificate in this case which require comment. The statute is not a one-way street and its provisions are available to both defendants and plaintiffs. Assuming that the certificate did, in fact, establish a presumption of accident because the coroner labelled it so, the certificate was also presumptive that the facts leading up to death by drowning were unknown. This is true because that is what the certificate says. If, under the statute, the certificate was prima facie evidence of its contents, then it was prima facie evidence that the circumstances leading up to death were unknown. In other words, it was prima facie evidence of nothing at all insofar as the circumstances of death were concerned. Being obviously contradictory in its terms, the certificate could not be admitted for any purpose, except perhaps, the fact and date of death, the place where the body was found and, under some circumstances, the cause of death (in this case, drowning). If the certificate operated to shift the flow of proofs from plaintiff at the moment of its admission because it showed death by accident, it immediately operated to shift the flow of proofs back to plaintiff because it is prima facie evidence that the producing cause of the drowning was unknown. Here, therefore, the result became a stalemate and the parties remained in the same position as before.

We are not convinced that a coroner's certificate is admissible as prima facie evidence of all of its contents

in any event. Our examination of the history of vital statistics and pedigree evidence, as accepted by the courts, leads to the conclusion that while such certificates are admissible in some cases and for some purposes, they are not always admissible for every purpose, notwithstanding the statute.

From earliest times matters of marriage, birth, death, burial and parentage have been important items in suits at law, and because these things are sometimes difficult to prove, special rules of evidence were made to apply. Both as a matter of necessity and because there is some circumstantial guarantee of trustworthiness in records made in family Bibles, church and cemetery registers, and on tombstones in burial grounds, the contents of these documents and things were admitted into evidence under the common law as prima facie proof of the facts therein or thereon contained. Without them, it would have been impossible, in many cases, to prove pedigree, or the time, either of the birth or death of obscure individuals: Carskadden v. Poorman, 10 Watts 82, 84. In fact, this type of proof was so important that the legislature passed the Act of 1700, 1 Sm. L. 20, sec. 1, 28 PS §131, making admissible the records of religious societies to prove marriage, birth or burial. While the Act was restricted to religious societies "within this province, or territories thereof," it was extended by the Act of March 31, 1837, P. L. 110, sec. 20, 28 PS §132, to admit proofs of death from records of religious societies and corporate towns outside the United States.

As time passed, the practice of making vital statistical records in family Bibles unfortunately fell into disuse along with the disappearance of the family Bible itself in some cases. A large segment of the people failed to associate themselves with religious societies, and in many instances local vital statistical records were either not kept at all or were kept in haphazard fashion. All

of this resurrected the problem which the pedigree exception to the hearsay rule had partially laid to rest, and as early as 1917 the need for a uniform vital statistics law was recognized by the National Conference of Commissioners on Uniform State Laws. By 1939 the Conference was considering a uniform act suggested by the United States Bureau of Census, and eventually a uniform act was adopted by the Conference. This became the law of the Commonwealth in the form of the Uniform Vital Statistics Act of May 21, 1943, P. L. 414, the predecessor of the Act of 1953 presently under consideration.

Although section 204 of the present act indicates an intent to make Pennsylvania forms consistent with standard forms used throughout the United States, the act does not deal with certificates issued outside the Commonwealth. Section 810 applies only to records filed in this State in accordance with the statute. This is some indication that the legislature had in mind only the law of Pennsylvania and was not concerning itself with the admissibility of certificates from other jurisdictions. The obvious intention of section 810 is to establish the integrity of our own records and then only in the light of existing law.

Under the common law, where the matters recorded were not material to the purpose of entry, Bible and other records were not admissible. Thus, a baptismal record recording the birth date of the child, or a death certificate setting forth the birth date of the deceased could not be received to prove birth dates; only baptism and death could be so proved: District of Columbia's Appeal, 343 Pa. 65, 73, 21 A 2d 883. Nor could ancient records be admitted which were made by persons who did not have knowledge of the matters entered: Sitler v. Gehr, 105 Pa. 577, 600-01; District of Columbia's Appeal, supra. Entries in family Bibles, for example, which were ordinarily admissible to prove pedigree

were excluded if the notations were made by a stranger to the family: Watson v. Brewster, 1 Pa. 381, 384. The reason for this is obvious. No circumstantial guarantee of trustworthiness can be ascribed to notations made by persons having no personal knowledge of the facts, nor can there be any presumed integrity in the recording of a circumstance which is collateral to the purpose for which an entry is made. Care in the recording in such cases would not be essential to the accuracy of the record with respect to the purposes for which made.

When section 810 became the law of Pennsylvania, the principles enumerated above were well-established and generally known throughout the Commonwealth. We can assume, therefore, that the legislature was enacting the law in the light of existing rules of evidence. Section 51 of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §551, provides that the intention of the legislature may be ascertained by considering, inter alia, the former law, if any, including other laws upon the same or similar subjects, and the consequences of a particular interpretation. Having this in mind, it is permissible to assume that the legislature never intended to dignify as evidence something of which a recording official had no personal knowledge, except perhaps those officially received items which bear upon the purposes for which vital statistics are kept, i.e., the dates of birth, death, marriage, divorce and other matters properly cognizable under the pedigree exception to the hearsay rule. It might even have been intended to provide for the admissibility of the cause of death, for this is important in the preparation of life experience tables, but there could have been no intention to provide for opinion evidence as to the circumstances bringing about a death. It would not be logical to assume that the legislature intended to make admissible a written statement of an official as to matters of which the same official could not testify if called as a witness.

Personal knowledge is the keystone of admissibility in opinion matters, except in the case of an expert who may express an opinion on proved facts. Certainly, the legislature could never have intended to convert into evidence something which is not evidence in fact, for if it did so, it was legislating in a climate in which it lacked power. See Rich Hill Coal Company v. Bashore, 334 Pa. 449, 7 A. 302. As said by Mr. Justice Butler in Western & Atlantic Railroad v. Henderson, 279 U. S. 639, 641-42, "Legislative fiat may not take the place of fact in the judicial determination of issues involving life, liberty, or property. . . ." Certainly, we may not adopt a construction of legislative intent which would render the provision in question unconstitutional. The Statutory Construction Act of 1937, P. L. 1019, art. IV, sec. 52, 46 PS §552(3), commands us to presume that the legislature did not intend to violate the Constitution.

It is our opinion that section 810 makes admissible, as prima facie evidence, the contents of a vital statistics record only insofar as such record conforms with established law in determining admissibility. It does not make such records admissible in all cases and under all circumstances, particularly where, as here, the person making the record testifies to facts which impugn the record's integrity, or where, as here, the record is self-contradictory. To hold otherwise would, in effect, transfer to the Department of Health the power to make inadmissible circumstances admissible into evidence merely by inserting a pertinent section in a required form. Neither the Department of Health nor the legislature can transgress the prerogatives of the courts with respect to the admissibility of a circumstance which is not in fact evidence. Courts are sworn to fidelity to the Constitution, including the due process clause, and are not bound to work the whim of another

branch of government. Justice cannot be thwarted upon such a shocking, contrary premise.

We conclude, therefore, that the certificate in this case should not have been received, or if received, should not have been exhibited to the jury or commented upon. If received at all, it should have been received as prima facie evidence of the fact, date and cause of death, but never as prima facie evidence of the circumstances leading up to the operation of the cause of death. Not only was there no necessity for the admission of the certificate because all of the available facts attending the occurrence were provable by living witnesses, but the certificate was self-contradictory and was admitted to be inaccurate by the very person who made it. For this reason, the jury by its questions having indicated that it was considering the certificate as substantive evidence, it is clear that material harm was done defendant.

And now, to wit, August 14, 1964, the rule granted on defendant's motion for judgment n.o.v. is discharged and the motion is dismissed; the rule granted on defendant's motion for new trial is made absolute and a new trial is awarded.