## Commonwealth *v.* Kosh, Appellant.

Argued September 28, 1931.   Before FRAZER, C. J., WALLING, SIMPSON, KEPHART, SCHAFFER, MAXEY and DREW, JJ.

148

*J. Julius Levy*, with him *Frank J. McDonnell*, for appellant.—The court erred in permitting the jurors to visit the scene of the killing and while there to be separated into three groups and while so separated to ask questions of the respective counsel and to be answered by said counsel all in the absence of the defendant: Peiffer v. Com., 15 Pa. 468; Com. v. Eisenhower, 181 Pa. 470; Com. v. Blakeley, 274 Pa. 100.

The court erred in denying defendant's motion to direct the jail physician to permit doctors to examine mental condition of the Commonwealth's chief witness for the purpose of impeaching his testimony: Com. v. Loomis, 270 Pa. 254; District of Columbia v. Armes, 107 U. S. 519.

It was prejudicial error to refuse to permit cross-examination of the Commonwealth's witness respecting her residence and name: Alford v. U. S., 51 Supreme Ct. 218.

It was error for the court to refuse to withdraw a juror when the district attorney, in his closing address, in effect gave testimony corroborative of the story of the principal witness for the Commonwealth: Com. v. Shoemaker, 240 Pa. 255.

The court erred in failing to instruct the jury as to the theory of the defense and in minimizing and destroying that theory, which was that Jimmie Mack was re-

sponsible for the killing, and in failing to instruct the jury as to the weight to be given the testimony of certain witnesses: Relf v. Rapp, 3 W. & S. 21; Penna. Canal Co. v. Harris, 101 Pa. 80; Pierson v. Duncan, 162 Pa. 187.

*Paul H. Maxey,* Assistant District Attorney, with him *John J. Owens,* District Attorney, for appellee.—The court did not err in permitting the jurors to visit the scene of the killing in the absence of defendant: Com. v. Salyards, 158 Pa. 501; Com. v. Van Horn, 188 Pa. 143; Com. v. Coontz, 288 Pa. 74; McDonald v. Pless, 238 U. S. 264; Com. v. Filer, 249 Pa. 171; Com. v. Reber, 10 Pa. Dist. R. 683; Com. v. Clay, 56 Pa. Superior Ct. 427; Com. v. Carter, 6 Pa. D. & C. R. 810.

The court did not err in denying defendant's motion to direct the jail physician to permit doctors to examine the mental condition of one of the Commonwealth's witnesses: Armstrong v. Graham, 4 Pa. 142.

Cross-examination of witnesses is largely within the sound discretion of the trial judge: Com. v. Quaranta, 295 Pa. 264; Glenn v. Traction Co., 206 Pa. 135; Com. v. Payne, 205 Pa. 101; Alford v. U. S., 51 Supreme Ct. 218.

It was not error for the court to refuse to withdraw a juror when the district attorney in his closing address made remarks to which counsel for defendant objected: Com. v. Del Giorno, 303 Pa. 509; Com. v. Del Vaccio, 299 Pa. 547, 549; Com. v. Massarelli, 304 Pa. 335; Com. v. Shoemaker, 240 Pa. 255; Com. v. Striepeke, 32 Pa. Superior Ct. 82; Com. v. Ezell, 212 Pa. 293; Com. v. Windish, 176 Pa. 167; Com. v. Weber, 167 Pa. 153; Com. v. Hickman, 231 Pa. 305.

OPINION BY MR. JUSTICE DREW, November 23, 1931:

Joseph Kosh was found guilty of murder of the first degree, with the penalty of death, and was duly sentenced; he then took this appeal.

The evidence is clear and convincing and gives us no room to doubt that defendant was justly found guilty. The victim, one Victoria Smolinski, also known as Marie King and Billie Mack, maintained a house of prostitution at 442 Oakford Court, Scranton. At the time of this crime, and for some months prior thereto, she had as inmates of the house three girls, Betty Labos, Virginia Costello and Barbara Newell. These girls had entertained many men in the house during the day and evening of November 27, 1930, which was Thanksgiving Day; and at about 12:30 A. M. on November 28, 1930, the last visitor having left the house, the three girls were together in the front room downstairs when they heard Marie King scream, "Don't, Biff, please don't, Biff, don't." The girls were terrified and in doubt what to do, but almost immediately the defendant came down the stairs, walked through the room in which they were, then through the rear room and out the back door, which he did not close after him. They knew him well, having seen him frequently in and about the house, visiting Marie King, over a period of months. Although the room in which they were was dark, they saw him plainly as he came down the steps with the light at the top of the steps shining down upon him, and walked past them and through the rear room in which there was a light. Their identification of him was positive. They had heard Marie King call the defendant "Biff" on many occasions. It was testified by others that he was sometimes called by that name. When the witnesses reached the second floor, they found Marie King lying dead in the rear room in a pool of blood, with a knife at her side.

The defendant was at this house at about 6 o'clock on the evening of November 27th and had dinner there with the deceased. He admitted having returned to the house at about 11:45, claiming that he had done so to get some money she had promised him. He asserted that he entered the house by the rear door and passed into the front room, and that she joined him. He said she gave

him thirty-five dollars and that he left the house almost immediately because she complained of having a headache and asked him to go home. He was not seen going upstairs. Two of the girls, Virginia and Betty, saw him enter the house about 11:30, and saw him with Marie King in the front room. These girls later went upstairs with men, and Betty said that when she went upstairs a second time, she noticed that the defendant and deceased had left the front room, and she testified that when she reached the second floor, Marie King called out to her from the rear room on that floor to "use Virginia's room." It was after this witness had returned to the first floor and joined the other girls, and after the last visitor had departed, that the girls heard and recognized Marie King's voice screaming, "Don't, Biff, please don't, Biff, don't."

The police made a thorough inspection of the premises shortly after the murder. They found all the windows on the second floor closed and nailed. It is obvious that no one entered or left the house by way of those windows. They also found that the only way to reach the second floor was by means of the staircase down which the witnesses testified they saw defendant come. These same witnesses, the inmates of the house, testified that after Barbara Newell had let the last visitor out of the house, shortly before they heard Marie King scream, they and those upstairs, meaning Marie King and Kosh, were the only people remaining in the house. They did not then know he was upstairs but they learned that fact when they saw him come down.

No money was found on the person of the deceased, although the inmates of the house had turned in to her from time to time during the preceding day and night the proceeds of their trade, and although she was accustomed to carry in her rolled stocking a sum of money with which to pay the fines of the inmates if they should be arrested. When the defendant was searched after he surrendered to the police at 2 o'clock the same morning,

thirty dollars in bills, together with a silver dollar, was found in his clothing. Betty Labos testified that she had handed to Marie King a silver dollar on the previous day, November 27th. The defendant insisted that he had received the silver dollar found on him from Marie King several days before the crime, and that he had kept it because she told him to keep it as a "lucky piece."

Marie King was brutally murdered. There were twenty-five knife wounds on her body, one of which went right through the heart, severing the aorta, which is the main artery leading to the heart. That was the largest and the mortal wound. The knife found by the side of the deceased was identified as having come from the kitchen of a lunch room which defendant visited less than two hours before the murder. He insisted that he had remained in the front part of that building and had not gone into the kitchen. The identifying witnesses were all connected with the lunch room and were positive in their identification. One of them, the cook, testified that he was accustomed to use the knife in his work, and that about midnight he had occasion to use it and had been unable to find it after diligent search. The defendant had ordered a cup of coffee and a package of cigarettes. He did not pay his bill but told the waiter he would see him later. It is apparent that he did not have any money at that time.

There was no eyewitness to the killing. However, this testimony, while circumstantial, is almost conclusive. It could hardly be stronger without an eyewitness. But the evidence is not entirely circumstantial, for there was proof of a confession as well. Stanley Kroptavich, a prisoner in the Lackawanna County Jail during the time the defendant was held there pending trial, testified that he had there become closely acquainted with the defendant and that defendant had told him that he had killed Marie King with a knife.

The defense which was sought to be proved was an alibi. Kosh denied that he went upstairs on the night

in question. He stated that he left the house a few minutes before twelve. He claimed he walked about the streets for a little while, then went to the Lackawanna Railroad Station for the purpose of using the lavatory, read a newspaper there, and at about 12:30 went to "Jen Duffy's" house of prostitution, where he went upstairs with a girl named Patsy. He claimed that after this girl learned his name she told him the police were looking for him, and that he then took a taxicab, went to a lunch room and purchased a sandwich and some cigarettes, and then took another taxicab to the city hall, where he gave himself up.

It is significant that Kosh was wholly unable to confirm his account of his movements by any witnesses. Even the girl Patsy was not produced as a witness. His own unconfirmed story of his movements from the time he left the house of Marie King until his appearance at the police station, almost two hours later, is all there is in the record on the subject. When he was questioned by the police at the time he gave himself up he refused to give any information, and said he would do his talking in court.

The defendant is a man of demonstrated violent temper, the kind that could commit a brutal murder. This is proven beyond peradventure by the fact that on February 2, 1926, at Syracuse, New York, he pleaded guilty to an assault in the first degree on his wife, committed on January 14, 1926, for which he was sentenced to from five to ten years in the Auburn Penitentiary. That was a murderous assault, he having shot his wife twice. At the time of this trial he was twenty-six years old. His criminal record, which is Commonwealth's Exhibit No. 17, shows that when he was but ten years of age he was twice charged with being guilty of larceny and paroled in the custody of his parents, and that in later years he was frequently arrested for that offense and others, including burglary, to which latter charge he pleaded guilty on December 23, 1922. His criminal record,

started at a very early age and continued since, proves conclusively that for years he has been an enemy of society and a dangerous man.

There are thirty-four assignments of error and we will consider those which have merit in the order of their importance. Assignments sixteen and seventeen are founded on a denial of a motion of defendant's counsel to permit two physicians employed by the defense to examine the witness Kroptavich with a view to establish his insanity and thereby impeach his testimony. The sole basis for this motion seems to have been the statement by the witness on cross-examination that his mother had become insane after being injured in a train robbery.

This motion was not presented to the court until after the testimony of the witness had been concluded, and after the Commonwealth had rested its case. The competency of the witness to testify was not questioned either before or during his testimony or at the time it was concluded. A motion to strike out his testimony was not made at any time. If a party knows before trial that a witness is incompetent on account of his mental condition he must make his objection before the witness has given any testimony, and if the incompetency appears on the trial an objection must be interposed as soon as the incompetency becomes apparent (see People v. Enright, 256 Ill. 221) ; but we do not rest our decision on these procedural considerations, since defendant's counsel claim to have been taken by surprise by the testimony of the witness.

The court saw and heard the witness, and had the fullest opportunity to observe his words and conduct, and decide in his own mind whether the testimony of the witness indicated that he was insane. The court refused the motion, and we think properly so, because at that time there was not anything before it that could possibly cause a doubt of the mental soundness of the witness.

The question of the mental soundness of one offered as a witness in its bearing on his competency has often been declared to be a question for the trial court: District of Columbia v. Armes, 107 U. S. 519; N. Y. Evening Post v. Chaloner, 265 Fed. 204; People v. Tyree, 21 Cal. App. 701; People v. Enright, supra; Lanier v. Bryan, 184 N. C. 235; Coleman v. Com., 25 Gratt. (Va.) 865. See also Com. v. Loomis, 270 Pa. 254. Its action is not reviewable on appeal unless it clearly appears by the proof that the trial court's determination of the matter was erroneous (see N. Y. Evening Post v. Chaloner, supra), or unless there was an abuse of discretion by the lower court (see Lanier v. Bryan, supra; 40 Cyc. 2243).

The burden of proving that a person offered as a witness is incompetent because of insanity is on the person asserting the incompetency. See People v. Tyree, supra; Batterton v. State, 52 Tex. Cr. Rep. 381; 28 R. C. L. 452; 1 Wigm. Ev., 2d edition, section 497. See also Com. v. Loomis, supra, where a former adjudication of insanity was held insufficient to establish incompetency; and see Com. v. Cilione, 293 Pa. 208. The court is not bound to order an examination on the question merely because counsel for the accused requests that it be done, where the court, after hearing the testimony of the witness, has no doubt of his mental soundness: Cannady v. Lynch, 27 Minn. 435; Williams v. State, 30 Ohio C. C. 342. As we said in Com. v. Scovern, 292 Pa. 26, at pages 31, 32, where the sanity not of a witness but of the accused himself was in question, "The legal test was, the doubt of the trial judge as to the sanity of the accused. Motions, pleas or petitions did not of themselves raise the doubt, but observation, examination, public or private investigation, might raise it. When the doubt existed, the trial judge determined the method of finding the fact. ...... The common law step necessary to start the investigation has not been abolished, and it is only when a real doubt exists in the

mind of the trial judge that it becomes his duty to grant the inquest." If this is the law with reference to the question of the sanity of the accused, a fortiori it should be such in the case of a mere witness.

Furthermore, incompetency does not necessarily follow from insanity. The general rule is that a lunatic or a person affected with insanity is admissible as a witness if he has sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue: Com. v. Loomis, supra, and cases therein cited. See 40 Cyc. 2201; 28 R. C. L. 451; 26 A. L. R. 1493; and see 1 Wigm. Ev., 2d edition, section 492, wherein it is stated: "This broad and rational principle—that the derangement or defect, in order to disqualify, must be such as substantially negatives trustworthiness upon the *specific subject of the testimony*—is now practically everywhere accepted." Mere mental derangement on some matter not connected with the subject of the litigation and not affecting the testimonial ability of the witness is not even to be considered by the jury in determining the credibility of the witness. See People v. Enright, supra.

Under these rules there was not the slightest basis for a contention that Kroptavich had any mental unsoundness affecting his competency or credibility. We have carefully reviewed every word of his testimony, and we find that his answers were as clear, coherent and consistent as the questions asked him, and as the testimony of any other witness in the case.

However, in order to make what seemed certain doubly certain, the court in banc, after hearing the argument on the motion for a new trial, and "solely for the purpose of further informing the conscience of the court," appointed two qualified physicians to examine Kroptavich, and they reported that on February 27, 1931, they examined him and that "he presents no evidence of mental deficiency nor is he addicted to the use of drugs in any

form. His memory is remarkable and he has full comprehension of right and wrong."

In view of the foregoing, it is manifest that so far as Kroptavich is concerned, defendant received more consideration than he was entitled to under the law; the fact is, defendant did not suffer in the slightest by the refusal of the court to grant the debated motion. And further, it is true that if the testimony of Kroptavich were entirely stricken out, there would still be ample evidence for conviction.

In the first assignment of error the defendant alleges that there was a separation of the jury which requires that a new trial be granted. On motion of counsel for defendant the jury was permitted to view the premises, the scene of the crime, and did so accompanied by the trial judge and in the custody of two sworn officers of the court. The premises consisted of a two-story building with a basement. The basement contained a kitchen and dining room, but these rooms were too small to accommodate counsel and all the jurors at the same time. The jury was taken in groups of four into the basement. While one group was actually in the basement, all the other jurors were on the steps or in the room leading to the basement, awaiting their turn to go down.

This separation was unavoidable and necessary in order to permit the jurors to view the basement, where the defendant and deceased had dinner the evening before the murder. The separation was very slight, as each group was within easy hearing distance of the other, and it lasted a short time only. It was in the presence of the trial judge and counsel, and the whole jury was constantly under the supervision of sworn officers of the court. The defendant does not complain that anything improper was done by anyone during the separation. No objection was raised at the time; in fact, defendant's counsel participated in what happened there, and it was not until after the verdict that this separation was proposed as a reason for granting a new

trial. This was too late had there been merit in the position, which there was not: Com. v. Coontz, 288 Pa. 74.

The kind of separation of jurors which is improper is described in Com. v. Eisenhower, 181 Pa. 470, as a separation "further than is necessarily required to enable them to perform their duties as such." It has been held proper to allow members of a jury to sleep in different rooms in a hotel: Com. v. Manfredi, 162 Pa. 144. It is not contended that the defendant was injured or prejudiced by anything the jurors did at that time, and the general rule is that a new trial will not be granted unless the alleged misconduct was prejudicial to the accused: Moss v. Com., 107 Pa. 267; Com. v. Gearhardt, 205 Pa. 387; Com. v. Filer, 249 Pa. 171; Com. v. Blakeley, 274 Pa. 100. Such matters rest largely in the discretion of the trial judge: Alexander v. Com., 105 Pa. 1.; Com. v. Manfredi, supra.

Affidavits of certain members of the jury, offered in support of the motion for a new trial, show that while one of the groups was in the basement a question was asked by a juror and was answered by an unindentified person. It is said that the question was, "Were the doors which were barred by bars laying across them in the same position as at the time of the murder?" and it is said that the juror was answered that the bars were placed on the doors by the police. The answering of this question is alleged to be ground for reversal.

There are two reasons why this contention is untenable. In the first place, the only proof consisted of the affidavits of jurors and in this State jurors are incompetent to give evidence to impeach their verdict in any way: Com. v. Filer, supra; Stull v. Stull, 197 Pa. 243. In the second place, counsel for defendant was present, and told the juror he might ask the question. It is fortunate the question and answer in no sense prejudiced the defendant. It was not until after the verdict that

counsel raised the question and then only as a reason for a new trial. We see no merit in his position.

The assignments of error, numbered two, three, four, five, and eighteen to twenty-three inclusive, may be grouped because all are objections to rulings of the court on evidence offered by the Commonwealth or the defendant. Some of these touch on an alleged possible connection with the crime of one Jimmie Mack, with whom Marie King and the inmates of the house lived when not present in the bawdyhouse. The defendant complains of the action of the court below in sustaining an objection to an offer to show by the defendant that Marie King had told him that she feared Jimmie Mack and that he would kill her if he learned that she was giving money earned in the house to the defendant. The alleged purpose of the offer was to show by inference that this fact may have been conveyed to Jimmie Mack, and that would supply a motive for the killing of Marie King by some other person than the defendant. The action of the court in refusing the offer was entirely proper, as there was no evidence in the case tending to connect Mack with the crime, and in the absence thereof this proposed testimony of defendant would at most create a bare conjecture. In Com. v. Bednorciki, 264 Pa. 124, the defense offered to prove that a third person had made threats against the deceased and that this third person was in the vicinity of the crime when it took place. The court rejected the offer on the ground that there was nothing to connect the third person with the crime, and his action was held proper. The evidence here was similar but even weaker than that which was there offered, and a doubt founded on such evidence would not be reasonable.

Similar considerations apply to the refusal of the court to allow a witness to testify that a few days after the murder she was asked by Jimmie Mack to clean the floor of the house, and that when she reported that she was unable to remove the blood stains from the linoleum, he told her to tear off the portions contain-

ing the stains. She was allowed to testify as to what she did, for the purpose of showing changes in the premises, but was not allowed to state that she acted at the instance of Mack. This, like the evidence mentioned in the paragraph next preceding, was of such slight probative value that it was properly rejected. There was testimony to show that Marie King operated the house for Mack, and that he derived whatever profit resulted from its operation, and that he was called by one of the inmates and came to the house immediately after the commission of the crime. His interest in the premises was that of a proprietor.

In the light of the foregoing, the court's statement in its charge to the jury that the appearance of Mack at the house after the crime had been committed seemed of little consequence, was justifiable. We think it was warranted by the evidence as a whole, and see no reason to condemn it.

Another ruling as to evidence which is challenged is the sustaining of objections to certain questions asked by the defense on cross-examination of Betty Labos as to where she lived before coming to Scranton, whether she had ever changed her name, what were her parents' names, and whether they were married when she was born. A close examination of the record shows that most of these questions were subsequently answered in her cross-examination. It is true that she was not permitted to state whether her parents were married when she was born. This question came clearly within the condemnation of the rule forbidding the impeachment of witnesses by matter calculated to humiliate and degrade: Com. v. Payne, 205 Pa. 101; Marshall v. Carr, 271 Pa. 271. In the former case, this court said, at page 104, "A vicious practice had at one time a considerable hold in some states (and to some extent still has in modern England) under the pretense of 'letting the jury know who the witness is' of allowing indiscriminate attacks upon the general character

and private life of adverse witnesses. No doubt there are cases where such knowledge might materially assist the jury in estimating the proper weight to be given to the testimony, but it was capable and usually productive of great abuse by throwing into the jury box wholly irrelevant matter merely intended to excite prejudice against the witness."

The twenty-fourth and twenty-fifth assignments of error attack the refusal of the court below to withdraw a juror and declare a mistrial because of certain remarks made by the district attorney in his closing address to the jury. Referring to the testimony of the three inmates of the house, the district attorney said, "They told the same story as they told the Commonwealth immediately after the murder, and it has not been changed one iota." The trial court directed the jury to disregard this statement, using the following language: "So that there will be no misconception of the rules of evidence, I want to say that when he stated to the jury that these girls had told to the Commonwealth practically the same story that they told on the witness stand, that that part of the statement made by the district attorney inadvertently with reference to what the girls may have told not here on the witness stand, should not be considered by you in any sense whatsoever. You will entirely ignore that. In the heat of argument, counsel very often inadvertently say something that on second thought they would desist from saying."

We think that this was a clear and ample correction of the effect of the remarks of the district attorney, and that it was therefore not an abuse of discretion to refuse to withdraw a juror. Where such correction is made, there is no ground for reversal: Com. v. Bubnis, 197 Pa. 542; Com. v. Torti, 283 Pa. 43. In Commonwealth v. Shoemaker, 240 Pa. 255, cited by defendant in support of his contention that these remarks demand reversal, this court found that the statements of

the trial court with respect to the language of the district attorney were so vague and indefinite that they were not a sufficient correction of the harm caused. Such is not the case here.

There is no merit in any of the assignments of error with which we have not specifically dealt. The facts and law of the case were fully and ably presented to the jury by the trial court.

The gravity of the judgment is such, a human life being at stake, that we have examined the whole record with the greatest care. There is no doubt that all the ingredients of murder of the first degree are present. The defendant had a fair and impartial trial, was represented by able and ingenious counsel, and was accorded every legal right and consideration due him.

The assignments of error are overruled, the judgment of the court below is affirmed, and the record is ordered remitted for the purpose of execution.