374 A.2d 509
COMMONWEALTH of Pennsylvania
v.
Glen ROLISON, Jr., Appellant (two cases).

Supreme Court of Pennsylvania.

Argued Oct. 14, 1976.

Decided June 3, 1977.

Bernard J. Brown, Carbondale, for appellant.

Robert J. Conway, Dist. Atty., Nicholas A. Barna, Stephen G. Bresset, Asst. Dist. Attys., Honesdale, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

O'BRIEN, Justice.

Appellant, Glen Rolison, Jr., was tried by a judge and jury and found guilty of murder in the first degree and conspiracy. Post-verdict motions were denied and appellant was sentenced to concurrent prison terms of life imprisonment for the murder conviction and ten-to-twenty years for the conspiracy conviction. This appeal followed.[1]

The facts are as follows. On August 11, 1973, the remains of Senen Garcia were discovered in a burnt automobile in Wayne County. An investigation revealed that the victim had been killed before the car caught fire. Police subsequently arrested appellant and three co-de-

---

1. A direct appeal from the judgment of sentence for the murder conviction was filed in this court. An appeal from the judgment of sentence for the conspiracy conviction was filed in Superior Court, which certified that appeal to this court.

fendants: Irma Garcia, wife of the victim; Cathy Brooks, daughter of Mrs. Garcia by a previous marriage; and David Lamberton. Ms. Brooks and Lamberton, both of whom pled guilty to murder and conspiracy, were prosecution witnesses in the separate trials of appellant and Mrs. Garcia, whose trial preceded appellant's by one month.

Appellant first argues that the trial court erred in denying his motion for a change of venue. During Mrs. Garcia's trial, appellant was named as the actual killer of the victim and this fact was reported in the local newspapers. Appellant moved for a change of venue and an evidentiary hearing was held on September 9, 1974. Appellant presented evidence that Mrs. Garcia's trial was the first murder trial to be held in Wayne County in twenty years. Wayne County has a population of approximately 30,000 people. Furthermore, appellant presented numerous articles from the four newspapers circulated in the county which had a combined circulation of 24,000 copies. Appellant produced witnesses who testified that a widespread belief existed that appellant was guilty. Following the hearing, the court denied appellant's motion without prejudice to renew the motion at trial.

Trial commenced on September 16, 1974, at which time appellant renewed his application for a change of venue. During the jury selection, appellant, on several occasions, renewed his request, which the court denied each time. We believe the trial court was correct in denying appellant's applications for a change of venue.

We have stated on many occasions that the disposition of an application for a change of venue is within the sound discretion of the trial court. *Commonwealth v. Martinolich*, 456 Pa. 136, 318 A.2d 680 (1974). A court, however, may not abuse its discretion so that a denial of a change of venue amounts to a violation of a defendant's due process rights. As this court stated in

*Commonwealth v. Stewart,* 449 Pa. 50, 52, 295 A.2d 303, 304 (1972):

"The minimal standards of constitutional due process guarantees [sic] to the criminally accused a fair trial by a panel of impartial and 'indifferent' jurors. . ."

We believe it best to analyze the trial court's denials of appellant's motions in two stages. First, this court must determine if the court below correctly denied the pretrial motion. Only after answering this question can we look at the court's denials of the applications made during voir dire. In *Commonwealth v. Dobrolenski,* 460 Pa. 630, 334 A.2d 268 (1975), this court adopted the view expressed by the A.B.A. Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press, § 3.2 (approved draft, 1968) which provides:

"(c) A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had . . . . *A showing of actual prejudice shall not be required.* (Emphasis added.)

"(d) If a motion for change of venue or continuance is made prior to the impaneling of the jury, the motion shall be disposed of before impaneling. If such a motion is permitted to be made, or if reconsideration or review of a prior denial is sought, after the jury has been selected, the fact that a jury satisfying prevailing standards of acceptability has been selected shall not be controlling if the record shows that the criterion for the granting of relief set forth in subsection (c) has been met."

As the comments to this section point out:

". . . Thus if change of venue and continuance are to be of value, they should not turn on the results

of the voir dire; rather they should constitute independent remedies designed to assure fair trial when news coverage has raised substantial doubts about the effectiveness of the voir dire standing alone."

■■ On pretrial applications for change of venue, we must first determine if potentially prejudicial material was, in fact, disseminated. In *Commonwealth v. Frazier,* 471 Pa. 120, 369 A.2d 1224 (filed February 28, 1977), this court defined three types of inherently prejudicial material:

1. References to a defendant's prior criminal record. *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209 (1973).

2. References to information received from police that a defendant had confessed. *Commonwealth v. Pierce, supra.*

3. Reports that go beyond objective reporting and become emotional and inflammatory. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

Other instances held to be inherently prejudicial were the televising of a defendant's confession, *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), and the televising of the entire criminal proceedings. *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L. Ed.2d 543 (1965). None of these types of material existed in the instant case. The pretrial publicity here had been "limited to factual accounts of the [earlier] trial [of a co-conspirator] and contained no inflammatory material . . ." *Commonwealth v. Pass,* 468 Pa. 36, 360 A.2d 167, 170 (1976); *Commonwealth v. Martin,* 465 Pa. 134, 348 A.2d 391 (1975); cert. den. 428 U.S. 923, 96 S. Ct. 3234, 49 L.Ed.2d 1226 (1976); *Commonwealth v. Hoss,* 445 Pa. 98, 283 A.2d 58 (1971). The court was thus correct in denying appellant's application for a

change of venue, for a fair trial was still possible absent a change of venue.[2]

■■■ Once a defendant has proceeded to voir dire examination of potential jurors, the scope of the analysis changes. A defendant may have venue changed only if he can show actual prejudice in the empanelling of the jury. *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). *Commonwealth v. Pierce, supra.* The Standards Relating to Fair Trial and Free Press, § 3.4(b) (approved draft, 1968), provide:

"Both the degree of exposure and the prospective juror's testimony as to his state of mind are relevant to the determination of acceptability. A prospective juror who states that he will be unable to overcome his preconceptions shall be subject to challenge for cause no matter how slight his exposure. If he has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his judgment will be affected, his acceptability shall turn on whether his testimony as to impartiality is believed. If he admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows unequivocally that he can be impartial. A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or

2. Should a court find any of the above-mentioned instances of inherently prejudicial material, it must follow the mandate of *Commonwealth v. Frazier,* which states at p. 132, 369 A.2d pp. 1229–1230:

" . . . if the record shows that there is a likelihood that a significant portion of the population was exposed to publicity of that nature, refusal to grant a change of venue would be an abuse of discretion unless the record also indicates that a sufficiently long period of time has passed between the time of the publicity and the time of the application for a change of venue for the court to conclude that any prejudice which may have been initially created by the publicity has been dissipated."

other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to his testimony as to his state of mind."

The comments further provide:

"Subsection (b) states the standard of acceptability. It does not propose that *any* knowledge of the case should disqualify, since under such a standard there would undoubtedly be many cases in which no jury could be impaneled. And in any event knowledge and bias are not synonymous. Nor does it propose that any admission of opinion on the merits of a case must necessarily disqualify, although application of such a standard would certainly not be undesirable whenever it appears feasible. Rather it recommends, as noted above, that both the juror's statements with respect to his state of mind and the nature and degree of his exposure should be considered. If he admits to an opinion which he claims he will be able to lay aside, the court should first consider the basis of the opinion. Is it derived from information that is certain to be developed during the course of the trial or that is not incriminating and would be excluded only on grounds of irrelevance? . . . If so, the court should still be reluctant to accept the juror, because of the probable effect of any preconception on the juror's deliberations, . . . and should sustain a challenge unless satisfied unequivocally that the juror can be impartial. It is essential that doubts be resolved against acceptability. And if the prospective juror has been exposed to and remembers reports of highly significant information (such as the existence or contents of a confession), or other incriminating matters that may be inadmissible in evidence, or particularly inflammatory material, he should be subject to challenge for cause whether or not he admits to an opinion. Such a stan-

dard appears to be not only desirable but constitutionally necessary if an impartial jury is to be obtained."

■ In the instant case, all fourteen jurors stated on voir dire that they had no opinion whatsoever on appellant's guilt. Appellant argues, however, that since it took six days to empanel the jury, this fact shows actual prejudice. This court stated in *Commonwealth v. Yount*, 455 Pa. 303, 313, 314 A.2d 242, 248 (1974):

> "Although the regular panel of jurors was in fact exhausted before the jury was selected, this circumstance alone obviously does not require a change of venue."

Once appellant proceeded to voir dire, he was unable to show any actual prejudice and his applications for change of venue were properly denied.

■ Appellant next argues that the court below erred in restricting defense counsel in the cross-examination of Trooper James Timko. Defense counsel attempted to question Trooper Timko about a statement which Cathy Brooks had given. The court, however, refused to allow any questions concerning the statement.

In *Commonwealth v. Bailey*, 450 Pa. 201, 299 A.2d 298 (1973), this court held that the extent of cross-examination is within the sound discretion of the trial court. We believe that the trial court did not abuse its discretion.

The court permitted defense counsel to use the statement in cross-examining Ms. Brooks. Several inconsistencies between her trial testimony and the statement were brought to the jury's attention. The trial court further stated in its opinion that the attempted cross-examination was beyond the scope of Timko's direct testimony. See *Commonwealth v. Schmidt*, 437 Pa. 563, 263 A.2d 382 (1970). Further, our review of the record shows that the trial court gave defense counsel broad latitude in cross-examining Trooper Timko. We believe the

trial court did not abuse its discretion in refusing the attempted cross-examination.

■ Appellant also claims that the trial court erred in refusing his motion for a mistrial because of alleged prejudicial remarks by the trial court during the course of the trial. The first instance complained of occurred following the court's refusal to allow appellant to cross-examine Trooper Timko concerning Ms. Brooks' statement. The court instructed appellant's attorney to restrict his cross-examination to those matters covered on direct. We can find nothing prejudicial in such a remark. Indeed, appellant, at that point, made neither an objection nor a motion for the mistrial.

Appellant, however, attempts to couple this incident with one that occurred later in the trial and argues that the cumulative effect of both incidents requires granting of the motion for mistrial. We do not agree.

In the cross-examination of David Lamberton, appellant's defense counsel asked Lamberton how he "knew" it was 4 a.m. when Lamberton and appellant arrived at the Garcia house. The following exchange took place.

"Q. How do you know it was 4 o'clock?

"A. I just surmised it.

"Q. You just surmised it?

"MR. CONWAY (District Attorney): Objection, Your Honor. He is still not letting the witness answer the question.

"MR. McGRAW (Defense Counsel): He can answer; that is what I want.

"MR. CONWAY: Perhaps if you will give the witness a chance to answer—

BY THE COURT:

"Q. Is there anything more you want to say, Dave?

"A. Just that Glen was pushing the time to be back there between 4:00 and 4:30 so his mother and father would know that he was there.

"MR. McGRAW: Your Honor, that wasn't my question.

"THE COURT: I know, but he is trying his best to answer. The man obviously doesn't know what time in the strictest sense of the word 'know.' But, when we are asked a question, 'do we know something,' we ordinarily use the word that strictly—

"MR. McGRAW: Your Honor—

"THE COURT: I know your name is Joe McGraw; but I really don't. I surmise it. You have always been known to me by that name; but I really don't know that is your name if you want to be strict about it. And we went through this thing a day ago of trying to take a word that in the ordinary use of the English language the ordinary person uses one meaning, and then you try to twist it around to a specific, narrow meaning, and try to make somebody untruthful in doing it; and this is not kosher. I blew my stack that day, and I will be doing it if you persist in this technique.

"MR. McGRAW: Your Honor, the only thing, time is very, very loose—

"THE COURT: I know what the man says, how he arrives; and then repeating, and repeating does not change the situation one iota.

"MR. McGRAW: Thank you, Your Honor.

"THE COURT: Now, let us try the case; and instead of trying to play games with semantics—"

Appellant then moved for a mistrial and the court denied his motion.

In *Commonwealth v. Goosby*, 450 Pa. 609, 611, 301 A. 2d 673, 674 (1973), this court quoted from *Commonwealth v. Phillips*, 183 Pa.Super. 377, 382, 132 A.2d 733, 736 (1957), and stated:

". . . 'Every unwise or irrelevant remark made in the course of a trial by a judge, a witness, or coun-

sel does not compel the granting of a new trial. *A new trial is required when the remark is prejudicial; that is, when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial.'* " (Emphasis added by this Court in *Goosby, supra.*)

We do not believe the remarks of the trial court were such that they "deprived the defendant of a fair and impartial trial."

■ Appellant next argues that the court erred in refusing to enforce a subpoena duces tecum, served by appellant on Cathy Brooks, to produce letters written to her by David Lamberton. At side bar, the court questioned the relevancy of David Lamberton's statements to the cross-examination of Ms. Brooks. Defense counsel conceded the relevancy question, but asked that the letters be produced so that Ms. Brooks would not have to be brought to court on some later date. The court told counsel it would enforce the subpoena when the letters became relevant. During examination of Lamberton, appellant failed to renew his request for enforcement of the subpoena. Under our decision of *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974) and its progeny, this claim is deemed waived.

■ Appellant next argues that the trial court erred in refusing his motion for a mistrial because a juror allegedly violated the court's sequestration order. Appellant brought to the court's attention the fact that a juror was seen operating his automobile, unaccompanied by a court officer, during the course of the trial. When summoned to chambers, the juror explained that, with the tipstaff's permission, he had moved his car to a place more suitable for parking because of the sequestration order. The juror testified that he talked to no one dur-

ing this period. Being satisfied with the explanation, the court denied the motion for a mistrial.

In *Commonwealth v. Gockley,* 411 Pa. 437, 457, 192 A. 2d 693, 703 (1963), we stated:

"It is a well established *general rule* that once a jury has been sworn in a capital case, its members may not separate until they have been discharged: [Citations omitted]. But we are living in a modern and practical age and there are exceptions to nearly every general rule. This Court has repeatedly held that the separation of the jury *even in a capital case* will not justify the grant of a new trial if it *clearly appears* that a juror was not improperly influenced and that the defendant was not prejudiced by what transpired." (Emphasis in original.)

We believe it is clear that neither was the juror influenced nor was appellant prejudiced by the juror's act of moving his car.

Appellant finally argues that the lower court erred in permitting Cathy Brooks to testify. Along with challenging Ms. Brooks' competency, appellant alleges that the trial court should have held an evidentiary hearing on the witness' competency. We find no merit in either contention.

 It is within the sound discretion of the trial court whether such an examination should be held. It is also within the trial court's discretion to determine if a witness is competent to testify. In *Commonwealth v. Ware,* 459 Pa. 334, 329 A.2d 258 (1974), this court stated:

". . . The mental competency of every witness is presumed; the burden of proof of incompetency rests on the party opposing the witness. However,

'the fact that the witness is, at the time of testifying, or was shortly beforehand, a lawful inmate of an asylum for mental disease or defect, or an ad-

judged lunatic or defective, makes it necessary that his capacity should be examined into and an express finding appear.'

"2 J. Wigmore, Evidence § 497, at 589 (3d ed. 1940); see *District of Columbia's Appeal*, 343 Pa. 65, 72, 21 A.2d 883, 887 (1941).

"The standard of testimonial competency is carefully formulated to exclude factors extraneous to trustworthiness:

'The general rule is that a lunatic or a person affected with insanity is admissible as a witness if he has sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue. . . .'

"*Commonwealth v. Kosh*, 305 Pa. 146, 156, 157 A. 479, 482 (1931)." (Footnotes omitted.)

 Cathy Brooks was confined to the Allentown Hospital for the mentally ill. The court did, in fact, make an examination of her capacity by reviewing records from Allentown Hospital and the report of a court-appointed psychiatrist. These records were given to appellant, who used them to effectively cross-examine the witness.

Even more importantly, the trial judge here had taken Ms. Brooks' guilty plea. He also heard her testify at Irma Garcia's trial. Under these circumstances, he had ample opportunity to observe the witness at different times. See *Commonwealth v. Kosh, supra*. Under these circumstances, we cannot say that the court abused its discretion in permitting Ms. Brooks to testify without first holding a hearing on her competency as a witness.

Judgments of sentence affirmed.

Former Chief Justice JONES took no part in the consideration or decision of this case.

EAGEN, C. J., and NIX, J., concur in the result.

MANDERINO, J., files a dissenting opinion in which ROBERTS, J., joins.

MANDERINO, Justice, dissenting.

In *Commonwealth v. Frazier*, 471 Pa. 121, 369 ·A.2d 1224, (J444 of 1975, filed Feb. 28, 1977), we concluded that,

". . . appellant's right to be tried by an impartial jury, as guaranteed by the Sixth Amendment to the United States Constitution and by Article I, Section 9 of the Constitution of this Commonwealth, was violated because the nature of the pretrial publicity was such that one exposed to it would be unable to serve as an impartial juror, and because the extent of that pretrial publicity was such that virtually every prospective juror in the county was exposed to it."

We reached this conclusion in part because the pretrial publicity ". . . directly implicated [Frazier] as the confessed killer of a young local girl." *Id.* at 129, 369 A.2d at 1228. Thus, in *Frazier*, we were dealing with pretrial publicity exposing potential jurors to an accused's prior criminal record and to his alleged confession. Exposure to such news accounts was held to be "inherently prejudicial", thus requiring the prosecution to show that a sufficient period of time had elapsed between the publicity and the commencement of the jury selection process so that the effects of the publicity could properly have been said to have dissipated. The three areas of "inherently prejudicial" pretrial publicity referred to in *Frazier*, and summarized in the majority opinion here, were not intended to be all inclusive however. The potential for prejudice results from the jurors' exposure, outside of the judicial process, to evidence which points the finger of guilt at the accused. It is the inculpatory content of the pretrial publicity that is im-

portant. The exact nature of this inculpatory content—whether it be publication of an accused's prior criminal record, of an alleged confession, or, as here, evidence presented in a co-defendant's trial—is relevant only because it has an unavoidable effect on the minds of prospective jurors. Where the content is such that it would deny an accused's right to be tried by a "panel of impartial and 'indifferent' jurors", *Commonwealth v. Harkens*, 459 Pa. 196, 199, 328 A.2d 156, 157 (1974), where a large percentage of the potential jurors in the county was exposed to such publicity, and where the prosecution has not shown the effects of such publicity to have dissipated, it is an abuse of discretion not to grant the requested change of venue. I believe that the nature of the pretrial publicity here, although different in content than the pretrial publicity in *Frazier*, was such that appellant was denied a fair trial by an "impartial and indifferent" jury, and I therefore dissent.

In the present case Wayne County, a relatively small, primarily rural county with a population of approximately 30,000, was saturated with news coverage concerning the crime for which appellant was tried and convicted. On August 15, 1974, less than two weeks before appellant's initial request for a change of venue, and approximately one month before the commencement of jury selection for appellant's trial, one of appellant's co-defendants, Irma Garcia, was found guilty of murder and conspiracy for the slaying of Senen Garcia (the other two persons indicted had already plead guilty). Irma Garcia's trial was the first murder trial to take place in Wayne County in over twenty years. It received widespread notoriety throughout the county; particular attention being focused on the four persons accused of the homicide. Testimony taken at the trial of Irma Garcia, which testimony was thoroughly reported by the news media, repeatedly implicated appellant as the person who actually killed Senen Garcia.

In *Commonwealth v. Frazier,* 471 Pa. 121, 369 A.2d 1224 (J444 of 1975, filed Feb. 28, 1977), relying on *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209 (1973), *cert. denied,* 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973), we concluded that pretrial publicity

". . . can be pretrial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting the defendant to any burden of establishing a nexus between the publicity and actual jury prejudice."

The *effect* of the pretrial publicity in the instant case is identical to the effect of the publicity in *Pierce* and *Frazier.* In each case, the pretrial news coverage caused a substantial portion of those people exposed to it to conclude that the defendant was guilty of the crimes charged. This fact was dramatically illustrated during the *voir dire* examination of prospective jurors held prior to appellant's trial. Of a total of 228 prospective jurors who were interviewed individually, 111 were asked if they had read of the case in the newspapers or had seen or heard news coverage on television and radio. One hundred and one replied "yes". Fifty-three were asked if they had discussed the case with their families or friends; forty-one replied that they had. Twenty-two were asked if they were familiar with the facts of the trial of appellant's co-defendant, Irma Garcia, and if they knew the result of that trial; nineteen responded affirmatively. Sixty-four challenges for cause were made relating to the prospective jurors' formation of fixed opinions of guilt which resulted from their exposure to the pretrial publicity; sixty-one of these challenges were granted.

These statistics confirm the conclusion that the pretrial publicity which formed the basis for appellant's change of venue motion was "so sustained, so pervasive, so inflammatory, and so inculpatory" that a change of

280

venue was the only means to assure that appellant was tried by a panel of "impartial and indifferent" jurors.

I would therefore reverse the judgment of sentence and remand for a new trial.

ROBERTS, J., joins in this dissenting opinion.