400 A.2d 1305

**COMMONWEALTH of Pennsylvania**

v.

**James Leroy SUTTON, Appellant.**

Supreme Court of Pennsylvania.

Argued March 9, 1979.

Decided May 1, 1979.

48

J. David Ungerman, Erie, for appellant.

Robert H. Chase, Dist. Atty., Frank J. Scutella, Asst. Dist. Atty., Erie, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION

O'BRIEN, Justice.

Appellant, James Leroy Sutton,[1] was tried by a judge sitting with a jury in connection with the burglary-robbery of Czartoryski Cafe and the homicide of James Hogan, a well-known Erie personality and district justice. Appellant was convicted of murder of the second degree, burglary, robbery, criminal conspiracy and a violation of the Uniform Firearms Act. He was sentenced to life imprisonment for the conviction of murder of the second degree and a consecutive ten-to-twenty-year sentence on the robbery conviction. He appealed the judgment of sentence imposed on the homicide conviction to this court and the judgment of sentence for robbery to Superior Court, which certified that appeal to this court for disposition.

Appellant argues that the trial court erred in failing to sequester the jury. We agree.[2]

Pa.R.Crim.P. 1111 provides:

"(a) The trial judge may, in his discretion order sequestration of trial jurors in the interests of justice.

"(b) When sequestration is ordered, each juror, including any alternate, shall be sequestered from the time of acceptance as a juror until discharged.

"(c) Nothing in subsection (b) shall prevent a trial judge from ordering sequestration, or vacating his order of sequestration, at any time during a trial when the interests of justice require."

On March 25 and April 2, 1976, a hearing was held on appellant's motion for change of venue. The basis of the motion was the publicity surrounding appellant's prior guilty

1. Appellant previously pleaded guilty to the James Hogan homicide. This court permitted withdrawal of the guilty plea and remanded the case for a new trial. *Commonwealth v. Sutton*, 465 Pa. 335, 350 A.2d 793 (1976).

2. Because of our disposition of this issue, we do not reach the issue of whether the court erred in not granting a change of venue.

plea and this court's action in permitting withdrawal of the plea. The court below denied the change of venue motion.[3]

On May 10, 1976, at the beginning of the jury selection process, defense counsel moved for the sequestration of the jury. The basis of this request was recent newspaper articles dealing with the beginning of appellant's trial.

The court denied the motion. During the three days of jury selection, defense counsel requested the court to reconsider its denial of the change of venue motion. In support of the motion, defense counsel introduced newspaper articles from the two newspapers in Erie, the Morning News and the Times. A review and short summary of the newspaper articles is necessary for a. resolution of the issue:

1. The Erie News of August 23, 1973, the headline story concerned the arrest of four suspects in the Hogan slaying.

2. A May 10, 1976, story indicated that the "Sutton Murder Trial Tops Court Agenda." The story stated that appellant was the alleged "triggerman" and that he had pleaded guilty to the Hogan shooting. While serving a life sentence, the Supreme Court allowed him to withdraw his guilty pleas and go to trial. The article concluded by listing the names and the prison sentence of three other men involved in the Hogan shooting.

3. May 10, 1976, Erie Times. This article stated that jury selection began and appellant was led into court in handcuffs accompanied by three sheriffs. The article detailed appellant's guilty plea and this court's ordering of withdrawal of the plea and a new trial. The story concluded with a statement that the district attorney would allege that Sutton was the triggerman and then listed the names of the alleged three men convicted previously and their sentences.

4. May 11 Evening News. The story indicated tight security precautions and the placement of three deputy sheriffs in the courtroom. These measures were then de-

---

3. The record of that hearing centered on television and radio news coverage concerning the homicide, the guilty plea, and this court's reversal of the judgment of sentence.

scribed as routine. The story continued that the judge cautioned prospective jurors not to discuss the selection process and that two jurors had been selected. The article went on to state that the Commonwealth expected to prove appellant fired the shotgun. In conclusion, the article detailed appellant's prior guilty plea and this court's reversal and remand for a new trial.

5. May 12, Morning News. The news story indicated that the trial court had rejected defense counsel's motion for a gag rule. The defense sought to have the court order the deletion from news articles of any reference to appellant's previous guilty plea and granting of a new trial, as well as the use of the word "triggerman" which appeared in articles of May 10 and 11. The article went on to quote the judge as follows:

". . . said that publicity in the case may be developing a jury whose members 'don't read newspapers, watch television news, or know what's happening in the community around them.'

"He said he didn't know 'if that's the kind of jury' that should be empaneled."

The story concluded by again reiterating Sutton's guilty plea and this court's reversal and remand for a new trial.

6. May 13, Evening News. The article reported the dissatisfaction of defense counsel with the trial court's rejection of his motion for a gag rule and indicated the reasons for the gag rule, i. e. the use of the word "triggerman" and appellant's guilty plea. The story indicated the continuation of the jury selection process and the names of recently empanelled jurors. The column concluded by reporting the previous guilty plea and the remand for a new trial.

7. May 14 Morning News, Article indicated that two more jurors had been chosen. The story continued by indicating that Sutton was the alleged "triggerman," but that he claimed it was an accident. Story closed by again detailing the previous guilty plea and the court reversal and remand.

8. A second article from the Friday, May 14 Morning News indicated that the jury selection took four days and required the questioning of ninety-four prospective jurors. The story indicated that testing began on May 13, 1976. A quote from appellant appeared in the story indicating his ambivalence concerning the fairness of the jury. The story continued by highlighting the district attorney's opening remarks to the jury:

a. The district attorney stated that the Commonwealth intended to prove burglary, conspiracy, robbery, crime with a firearm and felony murder.

b. That even if the killing was accidental, if committed during a felony, it would be murder.

c. That there would be evidence introduced showing that appellant had been drinking on the day of the homicide but the jury should consider whether appellant knew what he was doing at the time of the shooting.

This story also contained the references to appellant's three co-defendants having pleaded guilty and also mentioned appellant's previous guilty plea and this court's reversal and remand. The article continued with this quote from the district attorney's opening statement:

"District Justice Jimmy Hogan died in this case because of the greed of the man sitting behind the defense table James LeRoy Sutton."

The story concluded "Sutton, the alleged triggerman, showed no emotion during the district attorney's opening statement."

9. The Saturday, May 15 edition of the News had the following headline on Page 3: "Witnesses to Identify Sutton as Slayer." The following story accompanied it:

"The only person to see the face of James Hogan's killer is expected to identify James LeRoy Sutton as the trigger-man in the 1973 slaying when Sutton's murder trial resumes Monday morning.

"Thomas McBride, 1939 E. 19th, took the stand as the Commonwealth's key witness in the case late Friday afternoon. But the beer truck driver's testimony was inter-

rupted before he could identify Sutton as the trial was recessed by Judge Fred Anthony.

"McBride, a patron in Czartoryski's Cafe, 3rd and Parade, has testified in previous trials that he pulled the red ski mask from the gunman's head.

" 'He will identify Sutton when we resume on Monday,' a member of the District Attorney's staff said Friday afternoon.

"Meanwhile, an admitted participant in the robbery-murder, who is expected to appear as a defense witness, was locked in solitary confinement at the Erie County Jail Friday after allegedly striking a guard.

"Clarence Fiero, 24, who is serving 10–20 years at the Rockview State [Penitentiary], was placed in the isolation cell after the incident with the guard, local prison officials said."

The article continued by stating that appellant had previously pleaded guilty to the Hogan homicide, but this court permitted him to withdraw his guilty plea. The story detailed the testimony of David Prude, an alleged accomplice of appellant, who was a Commonwealth witness. The story indicated Prude's guilty plea and also stated that defense counsel attempted to impeach Prude with "minor discrepancies." The column ended by summarizing the testimony of Bernice Czartoryski, a witness. She described the crime and detailed how the decedent's wife went to him and how he was bleeding profusely from the stomach.

10. The Erie Daily Times of May 17 carried the following article:

"The James Sutton murder trial was to resume today with testimony identifying the defendant as the man who fired the shotgun blast which killed District Justice James T. Hogan.

"Thomas McBride, 1938 E. 19th, was one of several patrons at the Hogan family cafe, E. 3rd and Parade, early Aug. 19, 1973 when the robbery-murder occurred.

"It was McBride who pulled a red ski mask from the head of the robber who fired the shotgun. And the

district attorney's office said McBride would testify today that man was Sutton."

The article classified McBride's testimony as crucial. The story continued by listing some Commonwealth witnesses and then stated that one of the defense witnesses would be Clarence Fiero. Fiero was then described as having pleaded guilty and as serving a prison sentence.

11. The Erie Daily Times of May 18 contained a story indicating that defense counsel would appeal if Sutton was convicted. The article stated that the basis of the appeal was a remark by a Commonwealth witness, a North Erie police officer concerning the absence of certain physical evidence that could not be found. In response to a question, the officer remarked that "It was left here after the last trial." Defense counsel made a motion for a mistrial which was denied. The article continued that all prospective jurors who knew of appellant's prior guilty plea and this court's reversal and remand were excused from jury duty. The story then reiterated the prior guilty plea and this court's action.

12. The final article appeared Wednesday, May 19, 1976. The article indicated that appellant was expected to testify. The story continued by showing the defense strategy and stating that Fiero and Prude were serving prison terms for their involvement in the Hogan slaying. The story concluded by listing the crimes appellant was charged with.

The jury selection process started on May 10, and continued until May 13. The trial commenced on May 13 and concluded on May 20. The time of the newspaper articles was May 10 through May 19.

In *Commonwealth v. Bruno*, 466 Pa. 245, 352 A.2d 40 (1976), this court, in discussing whether a trial court had abused its discretion in failing to inquire of the jury whether they had read anything about Bruno's suppressed confession, stated:

"The procedure to be followed to ensure a fair trial in the face of prejudicial publicity is clearly within the sound discretion of the trial court. Because the choice of proce-

dure involves the balancing of fundamental rights—the defendant's right to a fair trial before an impartial jury and the rights associated with a free press—this discretion must be exercised with care. See *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209, cert. denied, 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973). . . .

\* \* \* \* \* \*

". . . As we stated in *Commonwealth v. Stewart,* 449 Pa. 50, 52, 295 A.2d 303, 304 (1972), cert. denied, 417 U.S. 949, 94 S.Ct. 3078, 41 L.Ed.2d 670 (1974):

'The minimal standards of constitutional due process guarantees to the criminally accused a fair trial by a panel of impartial and "indifferent" jurors.'
"See *Irvin v. Dowd,* supra, 366 U.S. at 722, 81 S.Ct. at 1642.

"Due process also requires that the jury consider only the evidence developed before it at trial. *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *Irvin v. Dowd,* supra; *Commonwealth v. Pierce,* supra; *Commonwealth v. Stewart,* supra.

\* \* \* \* \* \*

"Our cases also make clear that the trial court can avoid this presumption of prejudice by taking careful precautionary measures. For example, in *Commonwealth v. Dukes,* 460 Pa. 180, 331 A.2d 478 (1975), the jury was drawn from the same panel as the jury in a previous trial of the same defendant. The same situation occurred in *Commonwealth v. Free,* 214 Pa.Super. 492, 259 A.2d 195 (1969), and a new trial was ordered because of the possibility of prejudice. This Court, in *Dukes,* distinguished *Free* because 'the trial court was meticulously careful to ascertain that no member of the jury was aware of the

previous trial.' Each juror was questioned in private, and an extensive voir dire examination was allowed. . . .

\* \* \* \* \* \*

"When there is a possibility of highly prejudicial materials reaching the jury, the trial court must take appropriate protective action. Although the proper precautions are inevitably dictated by the circumstances of each case, they must reasonably ensure that no prejudice will occur."

The court in *Bruno, supra,* further noted that certain types of "inherently prejudicial" materials relieved appellant of showing a nexus between the publicity and the jury. See *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209, cert. denied, 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973).

Motions for change of venue exist to effectuate the criminal defendant's right to have a jury selected from impartial veniremen. Cautionary instruction against reading newspapers or listening to television or radio and sequestration are safeguards to continue that impartial jury after the voir dire is completed. The court in *Bruno* recognized this continuity of interests.

Change of venue cases such as *Pierce,* which dealt with inherently prejudicial reports, are instructive in dealing with the standards for judging proper precautions for insulating a jury already empanelled from newspaper, television or radio reports.

In *Commonwealth v. Casper,* 481 Pa. 143, 392 A.2d 287 (1978), this change of venue case surveyed the law dealing with pretrial publicity:

"Our cases make it clear that an application for a change of venue is addressed to the sound discretion of the trial court, and its exercise of discretion will not be disturbed by an appellate court in the absence of an abuse of discretion. E. g., *Commonwealth v. Scott,* 469 Pa. 258, 266, 365 A.2d 140 (1976); *Commonwealth v. Hoss,* 469 Pa. 195, 199, 364 A.2d 1335 (1976); *Commonwealth v. Kichline,* 468 Pa. 265, 273, 361 A.2d 282 (1976); *Commonwealth v. Powell,* 459 Pa. 253, 289, 328 A.2d 507 (1974); *Common-*

*wealth v. Russell,* 459 Pa. 1, 326 A.2d 303 (1974). 'In reviewing the trial court's decision, the only legitimate inquiry is whether any juror formed a fixed opinion of [the defendant's] guilt or innocence as a result of the pre-trial publicity.' *Commonwealth v. Kichline,* supra, 468 Pa. at 274, 361 A.2d at 287. Normally, one who claims that he has been denied a fair trial because of prejudicial pre-trial publicity must show actual prejudice in the empaneling of the jury. See *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Commonwealth v. Rolison,* [473 Pa. 261, 374 A.2d 509] supra; *Commonwealth v. Hoss,* 469 Pa. 195, 201, 364 A.2d 1335 (1976); *Commonwealth v. Pierce,* 451 Pa. 190, 195, 303 A.2d 209, cert. denied, 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973). But this rule is subject to an important exception. In certain cases there 'can be pretrial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting the defendant to any burden of establishing a nexus between the publicity and actual jury prejudice,' *Commonwealth v. Frazier,* 471 Pa. 121, 127, 369 A.2d 1224, 1227 (1977), because the circumstances make it apparent that there is a substantial likelihood that a fair trial cannot be had. See *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Commonwealth v. Rolison,* supra; *Commonwealth v. Dobrolenski,* 460 Pa. 630, 334 A.2d 268 (1975), citing American Bar Association Standards Relating to Fair Trial and Free Press § 3.2 (Approved Draft, 1968); *Commonwealth v. Pierce,* supra. It is this exception that we must discuss here.

"It is trite but true to note that a presumption of prejudice pursuant to this exception requires the presence of exceptional circumstances. Similarly, generalizations in this area are difficult because 'each case must turn on its special facts.' *Commonwealth v. Pierce,* supra, 451 Pa. at 198 n. 3, 303 A.2d at 213 n. 3, quoting *Marshall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 1172; 3 L.Ed.2d 1250, 1252 (1959). Nonetheless, there are certain

factors which this Court has identified as relevant to a determination of whether prejudice should be presumed.

"It is clear that the mere existence of pre-trial publicity does not warrant a presumption of prejudice. Similarly, a possibility that prospective jurors will have formed an opinion based on news accounts will not suffice. A frequently quoted passage in *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961), restates these points:

'It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'

"See also, e. g., *Commonwealth v. Richardson*, 476 Pa. 571, 578, 383 A.2d 510, 514 (1978); *Commonwealth v. Powell*, supra, 459 Pa. at 260, 328 A.2d at 511; *Commonwealth v. Martinolich*, 456 Pa. 136, 147–48, 318 A.2d 680, 687, appeal dismissed and cert. denied, 419 U.S. 1065, 95 S.Ct. 651, 42 L.Ed.2d 661 (1974); see generally *United States v. Williams*, 568 F.2d 464, 467–68 (5th Cir. 1978). Moreover, '[e]xtensive pretrial publicity within a county or district does not necessarily preclude a fair trial in that community.' *Commonwealth v. Powell*, supra, 459 Pa. at 260–61, 328 A.2d at 510. We instead look to more discrete factors, viz., whether the pre-trial publicity was, on the one hand, factual and objective, or, on the other hand, consisted of sensational, inflammatory and 'slanted articles demanding

conviction,' *United States v. Sawyers*, 423 F.2d 1335, 1343 (4th Cir. 1970); whether the pre-trial publicity revealed the existence of the accused's prior criminal record, whether it referred to confessions, admissions or reenactments of the crime by the defendant; and whether such information is the product of reports by the police and prosecutorial officers. Should any of the above elements be found, the next step of the inquiry is to determine whether such publicity has been so extensive, so sustained and so pervasive that the community must be deemed to have been saturated with it. In this connection the size and character of the area concerned, and more particularly the pervasiveness of the media coverage in the community, warrant consideration.

"The presence of one of the above elements does not, however, automatically warrant a presumption of prejudice. For example, as we noted in *Commonwealth v. Kichline*, supra, 468 Pa. at 277, 361 A.2d at 288–89, quoting *Commonwealth v. Nahodil*, 462 Pa. 301, 306, 341 A.2d 91, 93 (1975):

" ' "In *Pierce*, we condemned and proscribed the practice of police and law enforcement agents in releasing to the news media the existence and contents of statements or confessions given by those accused of crime. However, a violation of our ruling in *Pierce* does not necessarily mandate a new trial. It must also appear that the news accounts were so 'inherently prejudicial' that the possibility of a fair trial was questionable." '

"Similarly, we have focused on whether there has been such a 'cooling-off period' between the publicity and the commencement of trial that the prejudicial effect of the publicity may be deemed to have dissipated. The critical factor in the finding of presumptive prejudice, as the above review indicates, is the recent and pervasive presence of 'inherently prejudicial' publicity, the likely effect of which is to render a fair trial impossible. *Commonwealth v. Frazier*, supra; *Commonwealth v. Kichline*, supra; *Commonwealth v. Nahodil*, supra; *Commonwealth v.*

*Powell,* supra; *Commonwealth v. Russell,* supra." (Footnotes omitted.)

Applying the *Pierce-Casper* test to the publicity in this case, we believe that the court below erred in not sequestering the jury. Nine out of the twelve articles published during the voir dire and trial listed appellant's previous guilty plea and this court's reversal and remand. Six articles contained statements that appellant was the "triggerman" in the Hogan shooting. The May 15 edition quoted an unnamed member of the district attorney's staff as saying that appellant would be identified as the man who shot Hogan. The same article reported that a witness, David Prude, had pleaded guilty and that defense counsel sought to impeach his testimony with "minor discrepancies."

The series of newspaper articles is within the above factors articulated in *Pierce* and *Casper.*

Our next inquiry is whether the publicity was "so extensive, sustained and so pervasive" as to conclude that the community was saturated.

This record is clear that two Erie newspapers service the entire county and that the articles were published daily during the voir dire and trial. Moreover, since the publicity was coextensive with the proceeding, the cooling-off analysis is inapplicable.

In conclusion, when there is the type of publicity as that described in *Pierce* and *Casper* during or after voir dire, the court, upon its own motion or upon request, should sequester the jury.

Judgments of sentence reversed and case remanded for a new trial.

ROBERTS and NIX, JJ., concur in the result.

LARSEN, J., files a dissenting opinion.

LARSEN, Justice, dissenting.

I dissent; I would affirm the judgments of sentence and in support thereof, cite the Trial Judge's (Judge Fred P.

Anthony) opinion. Additionally, I do not believe the newspaper coverage of this trial was "inherently prejudicial", thereby relieving the appellant of the burden of showing actual prejudice. The Trial Judge's cautionary instructions were adequate to insure the appellant received a fair trial.